**Opinion issued January 7, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-10-00350-CV

———————————

**KEY OPERATING & EQUIPMENT, INC., Appellant**

**V.**

**WILL HEGAR AND LOREE HEGAR, Appellees**

**On Appeal from the 21st District Court**
**Washington County, Texas**
**Trial Court Case No. 33,968**

## OPINION ON REHEARING[1]

---

1   Will and Loree Hegar have filed a motion for rehearing of our October 13, 2011 opinion in which we reversed the trial court's judgment enjoining Key Operating & Equipment, Inc. from using a road that crosses the Hegars' property and rendered judgment in Key Operating's favor. We grant rehearing, withdraw our October 13, 2011 opinion and judgment, and issue this opinion and judgment in their place.

1

A mineral estate owner has an implied easement for reasonable use of the surface estate in developing and extracting the minerals below. In this appeal, we decide what happens when a mineral estate owner, Key Operating & Equipment, Inc., wants to use that easement to extract minerals from several mineral estates that it pooled together after the surface estate was severed from the mineral estate. Key Operating appeals from the trial court's injunction in favor of Will and Loree Hegar, the current owners of the surface estate, which prohibits Key Operating from using the road on their property to produce oil from a neighboring property. We affirm.

## BACKGROUND

Key Operating[2] operates wells and produces oil in and around Washington County, Texas, including two neighboring tracts of land referred to as the Richardson tract and the Rosenbaum-Curbo tract. Since 1987, Key Operating[3] has operated wells on the Richardson tract pursuant to an oil and gas lease. From 1987 through 1994, Key Operating used a road on land owned by the Ullrich family to access its operations on the Richardson tract. In 1994, Key Operating obtained an oil and gas lease on the Rosenbaum-Curbo tract—which abuts the Richardson

---

[2]     For purposes of this opinion, unless otherwise indicated, references to Key Operating include Key Operating's principals and predecessors in interest.

[3]     Key Operating's predecessor in interest at this time was Energy Resource Management.

2

tract—from Randy Boatright. After acquiring the lease on the Rosenbaum-Curbo tract, Key Operating built a road across the Curbo tract, which is a subpart of the larger Rosenbaum-Curbo tract,[4] and began using the road to operate the wells located on both the Curbo and Richardson tracts. Key Operating has used that road for its oil production on these tracts from 1994 until the present.

When the well on the Curbo tract stopped producing around 2000,[5] Key Operating's lease on the Rosenbaum-Curbo tract terminated. At that time, Key Operating's owners, brothers Thomas and Kenneth Key, acquired Randy Boatright's one-sixteenth interest in the Curbo tract mineral estate. The Key brothers then leased their interest in the Curbo tract to Key Operating.[6] The Key brothers' lease allowed for pooling, and in 2000, Key Operating pooled its mineral interests in the Richardson and Curbo tracts. The 40-acre pooled unit (the Richardson-Curbo pool) is comprised of 30 acres from the Richardson tract and 10 acres from the Curbo tract. Key Operating produces from the Richardson-Curbo pool via wells located on the Richardson tract, which it accesses using the road across the Curbo tract.

---

[4] The Rosenbaum-Curbo tract is 192 acres; 85 of those acres are the Curbo tract.

[5] The well on the Curbo tract is called the Rosenbaum No. 2 well.

[6] For purposes of this appeal, we assume that Key Operating's lease and pooling agreements are valid, enforceable contracts. No challenge to the agreements' validity or enforceability is before this Court.

3

In 2002, the Hegars purchased the surface estate and a one-fourth mineral interest in the Curbo tract from Charles Curbo. The Hegars knew when they bought the property that it was subject to oil and gas leases and that Key Operating used the road on the tract to service wells on the adjoining Richardson tract. The Hegars themselves currently use the road to access the home they built on the property. They tolerated Key Operating's use of the road until Key Operating drilled a new well on the Richardson tract that increased its use of the road. Will Hegar testified, "We're trying to raise a family and we can't do it with a highway going through our property."

In December 2007, the Hegars sued Key Operating for trespass and sought a permanent injunction against Key Operating's continued use of the road. The parties contested the nature of Key Operating's operations at trial. According to the Hegars, none of the oil Key Operating produces from the Richardson-Curbo pool is actually from the Curbo tract. They assert that Key Operating merely pooled the Curbo and Richardson leases to provide a basis for continuing to use the road on the Curbo tract to access its wells on the Richardson tract. According to Key Operating, the oil under the Curbo tract is migrating toward the Richardson tract as a result of the slope of a salt dome and the push of water below the surface, and this is the reason Key Operating pooled the leases and produces from both tracts via wells on the Richardson tract.

4

After a bench trial, the court permanently enjoined Key Operating from using the Hegars' surface, including the roadway, "for any purpose relating to the extraction, development, production, storage, transportation, or treatment of minerals produced from an adjoining" tract. The trial court filed findings of fact and conclusions of law at Key Operating's request, and this appeal ensued.

## Standing

In its second issue, Key Operating argues that the Hegars lack standing to complain about the formation of the Richardson-Curbo pool because they are not parties to the Curbo lease. The Hegars, however, are not challenging the formation of the pool. Rather, they contend that Key Operating has no right to use the surface of their tract to benefit another tract, even if all or a portion of those tracts are pooled together. As the surface estate owners, the Hegars have standing to bring this action for trespass on their property.

## Key Operating's Surface Rights

In its first issue, Key Operating contends that the trial court erred by enjoining Key Operating from using the surface of the Curbo tract. Key Operating contends that it has the right to full use of the road across the Hegars' property to access its wells on the Richardson tract by virtue of its lease and pooling agreement, and therefore it cannot be a trespasser and the court's order enjoining it from use of the road is in error. More specifically, Key Operating argues that

5

because its lease not only authorizes it to create pooled units, but also expressly recites that the acreage constituting such units shall be treated as if those acres were included in the lease, the lease terms allow Key Operating to use the surface of the Curbo tract to produce and remove minerals from that tract, as well as adjacent properties, so long as those other properties have been pooled with all or some of the Curbo tract.[7]

The Hegars do not dispute that Key Operating has the right to use the road across their property to produce minerals from the Curbo tract alone, but they dispute that Key Operating may use the road to produce from the pool. They further contend that Key Operating's surface rights would extend to the pooled area only if the lease authorizing pooling had been executed on or before the date the mineral estate was severed from the surface estate, but Key Operating's lease and pooling agreement was executed after the mineral estate was severed from the surface.[8] Specifically, they assert that the Keys' lease to Key Operating is not in

---

[7] Key Operating's lease provides that "production of oil or gas from any part of a pooled unit which includes all or a portion of the land covered by this lease, . . . shall be considered . . . production of oil or gas from land covered by this lease whether or not the well or wells be located on the premises covered by this lease," and "the entire acreage constituting such unit or units . . . shall be treated for all purposes. . . as if the same were included in this lease."

[8] In Texas, an oil and gas "lease" is not a lease in the traditional sense, but rather, it "grants a fee simple determinable interest to the lessee, who is actually a grantee." *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). Thus, either a deed or a lease of a mineral estate severs the mineral estate from the surface. *See, e.g.*, *Moser v. U.S. Steel Corp.*, 676 S.W.2d 99, 102 (Tex. 1984)

their chain of title; thus, they did not take their title subject to the lease and their interest in the surface is not limited by it. According to the Hegars, Key Operating's use of the surface estate "is limited to those rights that existed whenever the Boatright mineral estate was first severed, which was before [their] purchase [of the surface estate] and before the creation of the Key oil and gas lease and pooling agreement."

We agree in part and disagree in part. Specifically, we agree that Key Operating's lease and pooling agreements, which are not part of the Hegars' chain of title and to which they did not agree, cannot contractually expand Key Operating's right to use the Hegars' surface. But we disagree that Key Operating's surface rights necessarily exclude production from other tracts that have been pooled with the Curbo tract. We conclude that Key Operating has the same surface rights it has always had: the right to use the surface of the Curbo tract to produce oil from beneath the surface, regardless of whether that oil is comingled with oil from other tracts. Thus, Key Operating's right to use the road depends on the outcome of its third issue on appeal: whether the evidence is sufficient to support

---

(citing *Acker v. Guinn*, 464 S.W.2d 348, 352 (Tex. 1971) for the proposition that "the general intent of parties executing a mineral deed or lease is presumed to be an intent to sever the mineral and surface estates."); *Pounds v. Jurgens*, 296 S.W.3d 100, 107 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (holding that lease of mineral estate severs surface estate from mineral estate).

the trial court's finding that Key Operating is not producing any oil from the Curbo tract.

## A. The Hegars are not bound by Key Operating's lease or pooling agreement

The pooling of an oil and gas lease is a matter of contract, and the terms of a pooling agreement are interpreted according to general contract law. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 424 (Tex. 2008); *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). "The primary legal consequence of pooling is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit." *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999); *see Southland Royalty Co. v. Humble Oil & Ref. Co.*, 249 S.W.2d 914, 916 (Tex. 1952). When mineral interests are properly pooled, all interest holders in the pool are entitled to their proportionate share of the pool's production, regardless of where the well is drilled. *Samson Lone Star, Ltd. P'ship v. Hooks*, No. 01-09-00328-CV, 2012 WL 1951113, at *16 (Tex. App.—Houston [1st Dist.] May 31, 2012, no pet.) (op. on reh.) (citing *London v. Merriman*, 756 S.W.2d 736, 739 (Tex. App.—Corpus Christi 1988, writ denied)).

Generally, a mineral lessee's implied surface easement extends to the surface of a pooled area. *Prop. Owners of Leisure Land v. Woolf & Magee, Inc.*, 786 S.W.2d 757, 760 (Tex. App.—Tyler 1990, no writ) (citing *Delhi Gas Pipeline Corp. v. Dixon*, 737 S.W.2d 96 (Tex. App.—Eastland 1987, writ denied); *Miller v.*

8

*Crown Cent. Petroleum Corp.*, 309 S.W.2d 876 (Tex. Civ. App.—Eastland 1958, writ dism'd by agr.). The Hegars contend that this principle does not apply here, however, because the pooling agreement was entered into after the surface and mineral estates were severed and because they are not parties to the pooling agreement or the lease that gives Key Operating the right to pool. They further contend that Key Operating cannot contractually expand its surface rights, and thus diminish their surface rights, in an agreement to which they are not parties and by which they are not bound.

We agree that Key Operating and the Key brothers cannot contractually expand their surface rights against the Hegars in a lease and a pooling agreement executed after the mineral and surface estates were severed. If the Key brothers' lease, which authorizes Key Operating to pool the Curbo tract, had been executed before or at the time the mineral and surface estates were severed, this lease would have been part of the Hegars' chain of title and the Hegars would have taken their title to the surface estate subject to the lease. *See, e.g.*, *Robinson v. Robbins Petroleum Corp.*, 501 S.W.2d 865, 867–68 (Tex. 1973) (noting that surface owner obtained his title subject to mineral lease and, therefore, subject to implied right to use his surface to produce minerals covered by that lease); *see also Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex. 1982) ("[A] purchaser is bound by *every* recital, reference and reservation contained in or fairly disclosed by

9

any instrument which forms an essential link in the chain of title under which he claims.") (quoting *Wessels v. Rio Bravo Oil Co.*, 250 S.W.2d 668 (Tex. App.—Eastland 1952, writ ref'd)). Similarly, if the Hegars had ratified or otherwise subjected themselves to the lease, they would be bound by its terms. *See Cole v. Anadarko Petroleum Corp.*, 331 S.W.3d 30, 36–37 (Tex. App.—Eastland 2010, pet. denied) (holding that mineral lessee had right to lay pipe across surface estate for benefit of entire pooled waterflood unit when surface owner had ratified lease that authorized pooling).

But Key Operating has not demonstrated that its pool-authorizing lease or pooling agreement is part of the Hegars' chain of title, that the Hegars otherwise took their title subject to the pool-authorizing lease or the pooling agreement, or that the Hegars are in any way bound by the lease or pooling agreement. Thus, although Key Operating relies heavily on the provisions of its pooling agreement to support its right to use the road on the Hegars' land, the pooling agreement does not, itself, create that right. We thus turn to Key Operating's inherent surface rights, as the mineral lessee, to determine whether its use of the road across the Hegars' property is permitted.

**B.      Key Operating has an implied easement to use the road on the Hegars' property as reasonably necessary to produce oil from the Curbo tract**

When a property's mineral estate is severed from the surface estate, the mineral estate is the dominant estate. *See Moser v. U.S. Steel Corp.*, 676 S.W.2d

10

99, 103 (Tex. 1984); *Prop. Owners of Leisure Land*, 786 S.W.2d at 760 (citing *Acker v. Guinn*, 464 S.W.2d 348, 352 (Tex.1971)). Under the common law, the owner or lessee of the dominant mineral estate has a right to develop the minerals, which includes "an implied right to use the surface estate in ways reasonably necessary to carry out its operations[.]" *SWEPI LP v. R.R. Com'n of Tex.*, 314 S.W.3d 253, 256 (Tex. App.—Austin 2010, pet. denied); *see also Tarrant Cnty. Water Control & Imp. Dist. No. One v. Haupt, Inc.*, 854 S.W.2d 909, 911 (Tex. 1993) (stating that "the right to the minerals carries with it the right to enter and extract them" because "'a grant or reservation of minerals would be wholly worthless if the grantee or reserver could not enter upon the land in order to explore for and extract the minerals granted or reserved.'") (quoting *Harris v. Currie*, 176 S.W.2d 302, 305 (Tex. 1944)). This is sometimes referred to as an "implied surface easement." *See Prop. Owners of Leisure Land*, 786 S.W.2d at 760. A mineral owner or lessee's surface easement necessarily includes the rights of ingress and egress upon the land for the exploration and production of oil and gas. *See Ball v. Dillard*, 602 S.W.2d 521, 523 (Tex. 1980) (holding surface lessee unreasonably interfered with mineral lessee's right to access to land for mineral development purposes by locking gate to only usable road into property); *Moser*, 676 S.W.2d at 103 (stating that "[a] mineral owner, as owner of the dominant

11

estate, has the right to make any use of the surface which is necessarily and reasonably incident to the removal of the minerals.").

A mineral estate lessee's implied surface easement is not unlimited. The common law protects a surface owner through the accommodation doctrine, which requires that the mineral estate owner make reasonable use of the surface estate and exercise due regard for the rights of the surface owner. *See Lesley v. Veterans Land Bd. of State*, 352 S.W.3d 479, 492 & n.79 (Tex. 2011); *Tarrant Cnty. Water Control*, 854 S.W.2d at 911; *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 621 (Tex. 1971). Under the accommodation doctrine, also known as the alternative means doctrine, when a mineral estate lessee's intended use of the surface estate would preclude or impair an existing use of the surface by the surface owner, the rules of reasonable usage require the mineral estate owner to adopt an alternative means of exploration or production if such an alternative is available under established industry practices. *See Lesley*, 352 S.W.3d at 492 n.79; *Tarrant Cnty. Water Control*, 854 S.W.2d at 911. For the accommodation doctrine to apply, the factfinder must determine that the mineral estate lessee's use of the surface is not reasonably necessary under the circumstances of the case; in making this determination, the factfinder may consider whether there are reasonable alternative means of producing the estate's minerals that would not impair or preclude the surface owner's existing use and whether the surface owner could make reasonable

12

alternative use of the surface. *See Getty Oil*, 470 S.W.2d at 623. If the factfinder determines that there is only one reasonable means to produce the minerals, the mineral lessee retains an absolute right to use the surface estate in that manner. *See Tarrant Cnty. Water Control*, 854 S.W.2d at 911; *Getty Oil*, 470 S.W.2d at 622; *Valence Op. Co. v. Texas Genco, LP*, 255 S.W.3d 210, 215–16 (Tex. App.—Waco 2008, no pet.). Generally, the burden of proof is on the surface owner seeking to enjoin the mineral lessee's use of the surface estate. *See Getty Oil*, 470 S.W.2d at 623.

The question here is whether Key Operating's implied surface easement allows it to use the road across the Curbo tract to produce from the Richardson-Curbo pool. We conclude that, subject to the accommodation doctrine, Key Operating's common law surface easement gives it the right to use the road on the Curbo tract to produce oil from the Richardson-Curbo pool so long as that production includes production from the Curbo tract. We reach this conclusion based on (1) the nature of the implied surface easement, (2) practical and public policy considerations, and (3) analogous cases.

### 1. Pool-related rights are governed by contract principles but a mineral lessee's surface rights are imposed by law

Unlike pooling agreements and rights, a mineral estate owner or lessee's surface easement is not a matter of contract. It is a right imposed by law rather than agreement. *See, e.g.*, *Tarrant Cnty. Water Control*, 854 S.W.2d at 911; *see also*

13

*Corzelius v. R.R. Comm'n*, 182 S.W.2d 412, 416-17 (Tex. Civ. App.—Austin 1944, no writ) (recognizing legal restrictions placed on owner's use of his property are in derogation of owner's common law rights to use his property as he sees fits "[b]ut it is long since settled that the public has an interest in the natural resources of the State" and "that the production of oil and gas is affected with a public interest"). Thus, the mineral owner or lessee's right to use the surface estate exists even when the surface owner has never agreed to allow the mineral owner or lessee to do so. *See e.g.*, *Sun Oil Co. v. Whitaker*, 483 S.W.2d 808, 810–11 (Tex. 1972) (holding that mineral lessee's surface rights are "implied by law in all conveyances of the mineral estate and, absent an express limitation thereon, are not to be altered by evidence that the parties to a particular instrument of conveyance did not intend the legal consequences of the grant"). The right is appurtenant to the mineral estate and is necessarily conveyed with a possessory interest in the mineral estate. *See Harris*, 176 S.W.2d at 305.

Absent contractual modification, the operation of the implied surface easement is determined not by the terms of a contract but by the need from which it arises.[9] *See id.*; *Tarrant Cnty. Water Control*, 854 S.W.2d at 911 (stating that

---

[9] In fact, a mineral owner or lessee's implied surface easement is sometimes treated as an implied easement by necessity. *See Peacock v. Schroeder*, 846 S.W.2d 905, 910 (Tex. App.—San Antonio 1993, no writ); *Gulf Prod. Co. v. Colquitt*, 25 S.W.2d 989, 991 (Tex. Civ. App.—El Paso 1930) ("Mrs. Smith owned the surface estate, but such estate was burdened with an easement of necessity in favor of the

14

"the right to the minerals carries with it the right to enter and extract them" because "'a grant or reservation of minerals would be wholly worthless if the grantee or reserver could not enter upon the land in order to explore for and extract the minerals granted or reserved.'"); *Stradley v. Magnolia Petroleum Co.*, 155 S.W.2d 649, 652 (Tex. Civ. App.—Amarillo 1941, writ ref'd) (stating general rule that mineral owner "has as incidental to his ownership the rights and privileges that are necessary for the profitable production of such minerals, and in determining his rights the courts take into consideration the circumstances, the right conveyed, the purpose for which it was conveyed and the information of the grantor and grantee"). Because the easement is determined by the mineral owner or lessee's needs with respect to enjoying the benefits of ownership—i.e., access to the minerals—the mineral owner or lessee's precise use of the easement is not frozen in time, as the Hegars contend. *See, e.g.*, *Mr. W Fireworks v. Sw. Royalty, Inc.*, No.

---

state to enter upon and use the surface in so far as it was reasonably necessary for the purpose of developing the reserved mineral estate and removing such minerals."), *aff'd as modified*, 52 S.W.2d 235 (Tex. Comm'n App. 1932, judgm't adopted). In *Peacock v. Schroeder*, Peacock, like the Hegars, purchased a surface estate subject to an oil and gas lease possessed by Schroeder. 846 S.W.2d at 910. Peacock, like the Hegars, decided he wanted to prevent Schroeder from using the road across his land for oil operations. *Id.* Because there was no public road that Schroeder could use and Schroeder did not have an existing easement to use the road on another neighboring property, the court found that Schroeder had an implied easement of necessity. *Id.* "When a grantor conveys part of a tract of land and retains the remaining acreage, there is an implied reservation of a right of way by necessity over the land retained, when no other access exists." *Id.* (citing *Bains v. Parker*, 182 S.W.2d 397, 399 (Tex. 1944)).

15

11-08-00168-CV, 2010 WL 3064412, at \*3–4 (Tex. App.—Eastland Aug. 5, 2010, no pet.) (mem. op.) (holding that oil and gas operator had right to add gate and lock to road across surface estate when new surface owner's business increased traffic on road, but that operator could not exclude surface owner entirely from road by not providing him with key because such exclusion was not reasonably necessary to operator's use of road); *see also Severance v. Patterson*, 370 S.W.3d 705, 737 (Tex. 2012) (Medina, J., dissenting) ("[T]he burden on the servient estate is secondary to ensuring that the purpose of the easement is reasonably fulfilled. For example, oil and gas leases convey an implied easement to use the surface as reasonably necessary to fulfill the purpose of the lease.").[10]

Specifically, Key Operating's implied easement includes a right of "egress and ingress" and a right to "use of such portions of the surface for drilling, storing, pumping and transporting as are incidental to the full enjoyment of the lessee's exclusive privilege to drill for, produce and market the oil and gas." *Mobil Pipe*

---

[10] While the exact nature of an implied easement may change over time as necessary to fulfill its purpose, the Texas Supreme Court has noted that the location of an implied easement typically is static. *See Severance*, 370 S.W.3d at 721–22 (observing that location of implied easement is typically static but location of public beach easements is necessarily dynamic because boundaries of water change over time). In *Severance*, the Court held that "[a]lthough existing public easements in the dry beach of Galveston's West Beach are dynamic, as natural forces cause the vegetation and the mean high tide lines to move gradually and imperceptibly, these easements do not spring or roll landward to encumber other parts of the parcel or new parcels as a result of avulsive events" such as Hurricane Rita, but rather "[n]ew public easements on the adjoining private properties" had to be proven under the Open Beaches Act or the common law. *Id.* at 732.

*Line Co. v. Smith*, 860 S.W.2d 157, 159 (Tex. App.—El Paso 1993, writ dism'd w.o.j.) (citing *Sun Oil Company v. Whitaker*, 483 S.W.2d 808 (Tex. 1972)). While these rights are generally established at the time of severance, *see* 1 Ernest E. Smith & Jacqueline Lang Weaver, Texas Oil and Gas Law, section 2.1[B][1] at 2.17-18.2-18, the lessee's precise employment of these rights is necessarily somewhat dynamic—the lessee's needs for access, drilling, storing, pumping, and transporting necessarily ebb and flow over time, as does production from any given well. In the same way, the means of production may change over time and may eventually include a need to pool a tract with other tracts to keep production efforts fiscally viable.

Thus, while the Hegars are not bound by the terms of Key Operating's pooling agreement, Key Operating's need (if any) to pool the Curbo tract to maximize recovery of the oil from that tract is a circumstance that may affect what use of the Hegars' surface estate is "incidental to the full enjoyment of [Key Operating's] exclusive privilege to drill for, produce and market the oil and gas." *Mobil Pipe Line*, 860 S.W.2d at 159; *cf. Corzelius*, 182 S.W.2d at 417 (observing in oil and gas context that "the reasonableness of the steps taken must, of necessity, depend in large measure upon the facts and circumstances calling for such action"). The Hegars are not without protection from Key Operating's passing whims; the accommodation doctrine requires Key Operating to exercise its surface rights with

17

due regard for their interests. *See Lesley*, 352 S.W.3d at 492 & n.79; *Tarrant Cnty. Water Control*, 854 S.W.2d at 911; *Getty Oil*, 470 S.W.2d at 621.

## 2. Practical considerations favor allowance for pooling

Under the Hegars' theory of the law, mineral estate owners who did not own the surface estate could be prevented from pooling—although each would have a right to use the surface above his own mineral estate to produce from his mineral estate alone, none would have a right to use the surface above his mineral estate to produce from the pool. Effectively, a mineral estate owner who did not also own the surface could be precluded from recovering his minerals when production from his mineral estate alone was infeasible or cost prohibitive. Such an outcome would be contrary to Texas public policy, which generally favors efficient recovery of the state's natural resources and discourages waste of such resources. *See, e.g.*, TEX. WATER CODE ANN. § 1.003 (West 2008) (declaring that it is "the public policy of the state to provide for the conservation and development of the state's natural resources"); *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 835 (Tex. 2010) (quoting same); *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 46 (Tex. 2008) ("The Legislature has made it the policy of

18

this state to encourage secondary recovery of minerals, and has declared that waste in the production of oil and gas is unlawful.") (citations omitted).[11]

### 3. *Robinson* and other cases addressing similar, but distinguishable fact scenarios

The Hegars rely primarily on *Robinson v. Robbins Petroleum Corp*. In *Robinson*, the owner of a surface estate, Robinson, sought damages from an oil and gas lessee for three million barrels of salt water the lessee took from the surface estate and used to flood three waterflood units, each of which included a portion of the surface estate. 501 S.W.2d at 866–67. The lessee first claimed that the salt water was part of the mineral estate rather than the surface estate. *Id.* at 866. The Texas Supreme Court rejected this contention, then turned to the issue of whether the lessee's use of the salt water was nevertheless justified by its implied surface easement. *Id.* at 867. The Court rejected this contention as well, observing that there was "no proof in the record before us now of the necessity for the waterflood operation to obtain production of oil from the lands embraced by the [oil and gas]

---

[11] The Hegars own both the surface estate and approximately one-fourth of the mineral estate. The Hegars' one-fourth interest in the mineral estate does not appear to have ever been severed from the surface. *See Birdwell v. Am. Bonding Co.,* 337 S.W.2d 120, 131 (Tex. Civ. App.—Fort Worth 1960, writ ref'd n.r.e.) ("Until any particular fractional or percentage interest of mineral estate has been initially vested (through grant or reservation) in one other than the owner or owners of the surface estate, said interest in the mineral estate is not to be treated as having been 'severed' from the surface estate.") (citing *Thomas v. Sw. Settlement & Dev. Co.*, 123 S.W.2d 290 (Tex. 1939)). The Hegars do not explain how a partial severance operates with respect to surface rights and pooling under their theory.

19

lease." *Id.* "Without conclusive proof of that fact," the Court concluded, "the summary judgment in favor of the unit operator and owners was improper."

The *Robinson* Court went on to state that even if the lessee's waterflood operation was reasonably necessary to produce oil from the mineral estate below Robinson's land, "it does not follow that the operator is entitled to the use of [Robinson's surface estate] for [the entire waterflood operation.]" *Id.* The Court observed that nothing in the lease, which did not allow for pooling, or the reservation in Robinson's deed authorized the mineral owner to increase the burden on the surface estate for the benefit of additional lands. *Id.* at 868. The Court held that the lessee was entitled to "use of the salt water which was reasonably necessary to produce oil under [Robinson's surface estate,]" if any, but was liable to Robinson for "that portion of the salt water which has been consumed for the production of oil for owners" of other mineral estates. *Id.*

In applying the principles of *Robinson* to this case, we are mindful of some factual distinctions. First, this case does not involve waterflooding or the extraction of water from the Hegars' surface estate. *See id.* at 866. Second, Robinson's surface water was being used for the benefit of other mineral estates that were not pooled with, and could not be pooled with, the mineral estate beneath Robinson's land. *See id.* at 867 (stating that water was being used to benefit other "premises not covered by or authorized to be pooled"). Third and fourth, Key Operating's use

of the road is not a severable use that, like the salt water in *Robinson*, can be divided and borne proportionately by the Curbo and Richardson estates; nor is the road a depleting asset like salt water.

To the extent the Hegars rely on *Robinson* for the proposition that Key Operating cannot use the road across their land for the purpose of producing oil exclusively from the Richardson tract, we agree. *See id.* at 866–67. If the wells on the Richardson tract are producing oil only from the Richardson tract, Key Operating's use of the road is not "reasonably necessary for the development and production of [the Curbo tract's] minerals," *Sun Oil*, 483 S.W.2d at 811, or "necessarily and reasonably incident to the removal of the [Curbo tract's] minerals," *see Moser*, 676 S.W.2d at 103. But, as discussed above, if Key Operating is using the road to access wells that are producing oil from the Curbo tract, that use falls within Key Operating's easement to use the surface estate to the extent reasonably necessary for the production of the oil. That these wells also produce oil from the Richardson tract may be considered in determining what use is "reasonable" and what accommodations Key Operating must make for the Hegars' enjoyment of the surface estate, but it does not destroy Key Operating's surface easement.

*Robinson* does not dictate a contrary result. The *Robinson* Court held that lessee was entitled to use the surface estate's water for purposes of producing oil

from the mineral estate beneath the surface estate, subject to the accommodation doctrine, but not for purposes of driving oil in other mineral estates. *Robinson*, 501 S.W.2d at 868. Consistently, we hold that Key Operating is entitled to use the road water for purposes of producing oil from the mineral estate beneath the Hegars' property, subject to the accommodation doctrine, but not for purposes of producing oil only from other mineral estates.

Because the judgment and issues before us relate exclusively to injunctive relief, we need not determine whether Key Operating could be held liable to the Hegars for any use of the road in excess of its easement rights as was the lessee in *Robinson*. *See id.*; *see also Ball*, 602 S.W.2d at 523 (citing *Robinson* for the proposition that mineral lessee "has the right of ingress and egress upon the land for exploration and production of oil and gas" but "must not make an unreasonable use of the surface" or else "he can be held accountable in damages"); *Mobil Pipe Line*, 860 S.W.2d at 159 ("Even when the owner leases the surface, the owner retains a right to enter into agreements that will affect the surface. . . . But the lessee will be entitled to recover damages which result from an interference with the lessee's right to possession of the surface."); *Crawford v. Hrabe*, 44 P.3d 442, 448 (Kan. 2002) (stating that *Robinson* is more properly "construed to uphold the right of the surface and mineral owners of the off-lease water to have a cause of

22

action against [the mineral owner] than for [the surface owner] to have the right to restrict usage of off-lease water from coming on his premises.").

The central issue here, which is not addressed in *Robinson*, is whether Key Operating can use the road in a manner that is indivisible and reasonably necessary for both the Curbo and the Richardson mineral estates. The Hegars would have us hold that Key Operating's surface easement does not allow for use of the surface that benefits other mineral estates even if the mineral estate below the surface also benefits. Key Operating would have us hold that its surface easement is expanded to allow use of the Curbo surface estate for the benefit of any mineral estate pooled with the Curbo mineral estate, even when the pooling occurs in post-severance contracts that are not in the surface owner's chain of title and to which the surface owner has not consented. Instead, we hold that this question is decided under the accommodation doctrine. So long as Key Operating's use of the road benefits the Curbo mineral estate, Key Operating's surface easement is implicated; the question then becomes whether the use falls, wholly or partially, within the scope of the easement.

Texas courts have long decided disputes over the scope of a mineral owner's or lessee's surface easement and a surface owner's rights by conciliating the parties' rights and requiring reasonable accommodations between them. *See Humble Oil & Ref. Co. v. W.*, 508 S.W.2d 812, 815 (Tex. 1974) ("[T]his Court has

led the way in conciliating conflicts between owners of the surface and of the mineral rights, and in requiring reasonable accommodations between them.") (citing *Robinson*, *Sun Oil*, *Acker*, *Getty Oil*, and *Railroad Commission v. Manziel*, 361 S.W.2d 560 (Tex. 1962), among other cases). In doing so, courts balance not only the parties' interests but also the interests of society, considering both the immediate factual context and the relevant public policies. *See id.* at 816 (discussing *Getty Oil* and *Manziel*).

Our holding is consistent with the holding in *Miller v. Crown Central Petroleum Corp.* In *Miller*, Miller, the surface owner, brought suit for injunction and damages when a mineral estate lessee laid a pipeline across his surface estate pursuant to a waterflooding program for the mineral estate beneath his land, along with adjacent mineral estates. 309 S.W.2d at 877. As is the case here, when Miller purchased the surface estate, the mineral estate owner had previously leased the mineral estate under a lease that allowed for pooling. *See id.* at 877. It is not clear whether this was the initial lease of the mineral estate and was executed by a mineral estate owner who also owned the surface—i.e., it is not clear if the lease authorizing pooling occurred at or after severance of the surface estate. *See id.* at 877–79.

The *Miller* court reasoned:

Of course, no one would argue that the lessee did not have the right to lay pipelines or pipe said water across Millers' land for the purpose of

24

producing oil from wells on Millers' land. More oil is being produced from Millers' land as a result of piping the salt water across it. *The lessee is certainly not deprived of the right to do so merely because it also has the effect of producing more oil from other tracts not included in the leases of Millers' tracts but included in said unit.*

*Id.* at 878 (emphasis added).

Thus, we conclude that Key Operating has the same implied easement for use of the Hegars' surface estate that existed when it became a lessee of the Curbo tract's mineral estate: "[the Hegars] may not interfere with [Key Operating's] right to use the servient estate for the purposes of the easement"—i.e., for the purpose of exploring and producing oil from the Curbo tract. *Severance*, 370 S.W.3d at 721. This is true regardless of whether the oil is commingled with oil from an adjoining tract's mineral estate and regardless of whether the pool was created after the mineral and surface estates were severed. *See Mobil Pipe Line*, 860 S.W.2d at 159–60 (discussing Texas authority establishing that surface tenant's existing rights may be altered by subsequent mineral lease regardless of whether surface and mineral estates were severed); *Miller*, 309 S.W.2d at 878–79 (rejecting surface owner's attempt to enjoin lessees who had pooled their interests with other tracts from laying pipeline and piping salt water across surface to well on another tract for benefit of pool); *see also Ball*, 602 S.W.2d at 522–23 (holding surface lessee could not bar subsequent mineral lessee from use of surface). To the extent that Key Operating's pooling of the Curbo tract mineral estate with another tract's

25

mineral estate may result in Key Operating's continued or increased use of the road across the Hegars' surface estate, the Hegars' surface rights are protected under the common law by the accommodation doctrine.

But Key Operating has no implied right to use the Hegars' surface for production of oil exclusively from other tracts. Key Operating's right to use the road thus hinges on its contention that it uses the road for purposes of producing oil from the Curbo tract, and not merely the Richardson tract. We therefore turn to Key Operating's challenge to the sufficiency of the evidence to support the trial court's finding to the contrary.

### Sufficiency of Evidence that Key Operating Is Not Producing from the Curbo Tract

In its third issue, Key Operating challenges the factual sufficiency of the evidence to support the following fact finding made by the trial court:

> Key Operating Co. does not have authority to use the road on the surface of the [Curbo tract]. Although Key Operating Co. holds a lease of an undivided 12.5% of the minerals beneath the [Curbo tract], the usage of the surface is not reasonably necessary to enter upon and extract minerals from beneath the surface of the [Curbo tract]. Instead, the preponderance of the credible evidence shows that no minerals are being extracted from beneath the [Curbo tract] by the wells located on the Richardson [t]ract.

This finding, if supported by the evidence, is decisive of Key Operating's appeal. If Key Operating is not producing oil from the Curbo tract, it has no right to use

26

the surface of the tract. If Key Operating is producing oil from the Curbo tract, it has a right to use the surface of the tract subject to the accommodation doctrine.

## A. We apply a deferential standard of review

In reviewing a challenge to the factual sufficiency of the evidence, we consider and weigh all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). The trial court acts as factfinder in a bench trial and is the sole judge of the credibility of witnesses. *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). We may not pass upon the witnesses' credibility or substitute our judgment for that of the factfinder, even if the evidence would clearly support a different result. *Maritime Overseas Corp.*, 971 S.W.2d at 407. Accordingly, we defer to the factfinder's findings on contested evidence—the jury may believe one witness and disbelieve another, and it may resolve inconsistencies in any testimony. *Dyer v. Cotton*, 333 S.W.3d 703, 709 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *Eberle v. Adams*, 73 S.W.3d 322, 327 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)).

**B.      The parties presented conflicting evidence**

The trial court heard conflicting testimony from the parties' experts: George Hite for the Hegars and Don Urbanec for Key Operating. Generally, the experts disagreed about whether the wells on the Rosenbaum property, Richardson No. 1 and Richardson No. 4, were producing oil from the Richardson tract only or from both the Curbo and Richardson tracts. It is undisputed that the Rosenbaum No. 2 well, located on the Curbo tract under the Hegars' surface, is no longer being used to produce oil.

Hite is a petroleum engineer with forty-five years' experience. He began by discussing the basis for his opinions, which he formed by determining (1) what portion of the oil produced from the wells on the Richardson tract was produced by the Richardson No. 1 and what portion was produced by the Richardson No. 4 and (2) based on the production from the Richardson No. 4, from what area of land the Richardson No. 4 was draining oil. With respect to the first determination, Hite testified that the production from the Richardson No. 1 and No. 4 was "reported together and you don't know how much each well produced, but you can estimate it by looking at the decline area for one well and then the difference is the other one." Under this approach, Hite concluded that, of the approximately 25,000 barrels of oil produced from the Richardson wells from 2004 through July 2008, only 8,200 barrels were produced from the Richardson No. 4. Based on this

calculation, Hite concluded that the Richardson No. 4 draws oil from an area with a radius of 216 feet, which did not reach the Curbo tract.[12]

With respect to his ultimate conclusion, Hite testified as follows:

Q.  Now, based upon the analysis that you performed, what is your opinion as to whether or not the Richardson well is draining oil from the . . . Hegars' property here?

A.  I don't think it is. At this point, there's nothing being produced. There's no drainage. There's no production.

Q.  So in your opinion is oil migrating from the . . . Hegars' property across the lease line to reach the Richardson No. 4 well?

A.  No. I think what's happened in the past, the Rosenbaum 2 well was drilled in the early to mid-50's. It produced out of one sand, was completed and abandoned by Humble. It was reentered by another company in '95 and they got about 5000 barrels out of it. There's another well – and it was a dry hole. There's another well down here that's a dry hole.

In my opinion whatever oil that was on [the Curbo tract] has, No. 1, either been produced by the wells on the [Curbo tract], or has been produced over here already.

When asked whether he agreed with the expert report of Key Operating's expert, Urbanec, Hite testified:

A.  I don't agree with it completely, no.

Q.  Why not?

A.  His report seems to say that there is still oil migrating from the Rosenbaum lease to the Richardson lease and that it will

---

[12]  Hite testified that this area would be smaller if the well was water driven. Urbanec testified that both of the Richardson wells were water driven.

continue to do that. . . . I think what in fact has happened is that if in fact there are water drive reservoirs, the water has bypassed the [Curbo tract] and the oil on the [Curbo tract] or what was there has either been produced or it's trapped by the – by the invading water. I mean, once the oil-water contact passes it, it can't get through. It's – it's locked in place.

Don Urbanec is an oil and gas geologist and operator who also has over forty years' experience. He testified that the Richardson wells were water driven and "that water is picking that oil up and moving it from the [Curbo tract] over to the Richardson property." Urbanec disagreed with Hite's assumption that the wells were pressure depletion, rather than water driven, and contended that Hite "ignored production from the Richardson No. 1" in reaching his conclusion.

## C. We must defer to the factfinder's resolution of conflicting evidence

Key Operating contends that the Hegars' evidence is factually insufficient to support the trial court's finding because "under cross-examination, Mr. Hite admits that he does not have enough information to say definitively that oil is not migrating from the [Curbo tract] to the Richardson [t]ract and wells." The testimony underlying Key Operating's contention is as follows:

Q. Have you done any investigation to see if there were any mechanical problems with any of these wells?

A. Have no way of knowing that.

Q. Thank you, sir. Let me just propose something to you and see just how far off I am. Is-- is it possible, from a petroleum engineer's standpoint, that there could be water driving in this direction to these wells?

30

A. I think that occurred in the past.

Q. Okay. Can you rule out it's not happening today?

A. The wells aren't producing today.

Q. Well, there could be a number of reasons, mechanical or whatever. Without regards to whether the well's actually on line, could there be water taking oil over here?

A. I-- I don't know that without knowing more about the reservoir.

Q. You can't rule it out, can you?

A. Lots of these guys are ruling it out.

Q. Okay.

A. But I-- but I don't have-- there's not enough information to just-- I don't know what the pressures are.

Q. There's not enough information for you to emphatically say it's not happening.

A. I know it's not being produced.

Q. Okay. But my question is, if there were production, assume that there was production for me from these wells, they're on line. Okay? Can you tell this jury that water drive is not taking oil from over here into this area?

A. I'm pretty sure it's not, but there's nothing a hundred percent--

Q. Thank you.

A. -- but with reasonable certainly I think it's not being pushed up into the Rosenbaum well.

Q. Okay. Based on your studies.

A. Yes.

The applicable standard of proof in civil cases ordinarily does not require an expert to testify "emphatically" that a fact is absolutely certain. *See, e.g.*, *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997) (requiring expert testimony excluding other plausible causes of injury or condition with "reasonable certainty"); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001) (requiring that lost profits be proven with "reasonable certainty"); *Tex. Pac. Coal & Oil Co. v. Barker*, 6 S.W.2d 1031, 1034 (Tex. 1928) (stating that lessor's recovery for breach of covenant to protect or develop oil or gas requires expert testimony establishing with "reasonable certainty" the amount of gas lost due to breach). Hite testified to the relevant fact with "reasonable certainty" based on his calculations. Key Operating does not challenge Hite's qualifications to give an expert opinion or any specific aspect of his calculations and the bases for his opinion.

As the factfinder, the trial court was within its province to assess the credibility of the dueling experts, to believe the testimony of one and disbelieve the testimony of the other, and to resolve any inconsistencies in their testimony. *See Maritime Overseas Corp.*, 971 S.W.2d at 407; *Dyer*, 333 S.W.3d at 709. The trial court chose to credit Hite's testimony over the contradictory testimony of Urbanec. We must defer to the trial court's resolution of this issue. *See Dyer*, 333 S.W.3d at 709 (stating appellate courts defer to factfinders' findings on contested evidence

32

and witness credibility). We therefore affirm the trial court's finding and overrule Key Operating's second and third issues.

## CONCLUSION

Key Operating has a right to use the road across the Hegars' surface to explore and extract oil from the Curbo tract, even if the extracted oil is comingled with oil from the Richardson tract and produced using a well on the Richardson tract pursuant to a pooling agreement. But in the absence of a pooling or similar agreement to which the Hegars have consented or to which they or their title are otherwise subject, Key Operating has no right to use the road across the Hegars' surface to produce oil exclusively from the Richardson tract. Because the trial court determined that Key Operating's use of the road across the Hegars' surface relates to production of oil from the Richardson tract only, it did not abuse its discretion in enjoining Key Operating's use of the road for that purpose.

We affirm the trial court's judgment.


Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Sharp and Brown.

Justice Sharp, dissenting. Dissent to follow.

33