**CORZELIUS v. RAILROAD COMMISSION**
et al.

No. 9451.

Court of Civil Appeals of Texas. Austin.
July 19, 1944.

Rehearing Denied Sept. 27, 1944.

Dan Moody, and Black, Graves & Stayton, all of Austin, for appellant.

Grover Sellers, Atty. Gen., and E. R. Simmons, Asst. Atty. Gen., for appellee Railroad Commission.

Hornsby, Hornsby & Kirk, of Austin, for appellee H. M. Harrell.

BAUGH, Justice.

Suit was by appellant, plaintiff below, to set aside as invalid an order of the Railroad Commission and to enjoin H. M. Harrell from proceeding under such order. Trial was to the court without a jury and judgment entered that plaintiff take nothing; hence this appeal.

The particular order attacked was entered by the Commission on January 31, 1944, and was a reaffirmation and modification of a former order relating to the same subject matter entered by the Commission on November 19, 1943. The pertinent portions of the order under attack read as follows:

"Whereas, The Railroad Commission of Texas after due notice has held many hearings with reference to the conditions in the Bammel Field, Harris County, Texas, and pursuant to notice duly given held a hearing on January 28, 1944, to determine what rules, orders and regulations should be enacted and promulgated in order to prevent waste of oil and gas in Bammel Field, Harris County, Texas, and further to determine what remedial measures should be required to relieve the charged water sands in the field and to completely bring under control the F. M. Corzelius Meineke well in said field which has heretofore been found leaking, caught on fire and cratered, and further to determine whether the Commission's order of November 19, 1943, authorizing H. M. Harrell to drill a directional well in the Bammel Field, should be reaffirmed, amended, altered, or changed, and

"Whereas, From the evidence heretofore adduced the Commission finds that waste, as that term is defined in the statutes of this State, is now occurring in the Bammel Field and that the resulting condition remains serious, and

"Whereas, The Commission further finds that the F. M. Corzelius No. 2 Meineke well is still on fire and that much gas is being wasted, and further finds that the fresh water sands in this area are still charged with gas and that proper and necessary remedial work has not been accomplished to extinguish said fire and stop the contamination of fresh water sands in said area,

"Now, therefore, it is ordered by the Railroad Commission of Texas that H. M. Harrell be and he is hereby authorized as an agent of the Commission to continue to drill with all diligence the directional well provided for by the Commission's Order No. 3-5670, dated November 19, 1943, and said well is hereby directed to be drilled to a point at or near the bottom of the F. M. Corzelius No. 2 Meineke well and said H. M. Harrell is hereby directed as an agent of the Commission to proceed to attempt to kill the said F. M. Corzelius No. 2 Meineke well through said directional well in order to abate the waste which is now and has been going on in said field since the leak in the casing occurred in the F. M. Corzelius No. 2 Meineke well."

A review of the facts, circumstances and conditions existing in said gas field prior to and at the time the order attacked was entered, and up to the time of the trial hereof, will aid in a better understanding of the issues presented on this appeal. The Bammel field is located in Harris County. The proven field is owned entirely by the appellant and H. M. Harrell. . The gas sands are about 6,200 feet below the surface. The original bottom hole pressure was about 2,750 pounds per square inch. Corzelius owned a lease on approximately 80 acres acquired by him in 1941, on which he had one well, known as the Meineke No. 2, with an original potential production of 250 million cubic feet of gas per day. The gas produced by him from that well under supervision of the Railroad Commission was sold by him for industrial and municipal use as fuel. The remainder of the field completely surrounding Corzelius's tract was owned by H. M. Harrell who had 15 wells, two of which were injection wells. The cost of drilling and putting a well into

operation was approximately $100,000. Harrell was engaged entirely in recycling operations. That is, extracting the condensate from such gas and then repressuring the gas back into the producing strata through injection wells.

Corzelius drilled his well in 1942 and encased it part of the way with second run casing. A leak in his well developed, was detected by the employees of the Railroad Commission, and on June 30, 1943, the Commission ordered Corzelius to recondition his well so as to "stop any gas from leaking through the casing and charging the upper sands." Corzelius then, in early July, 1943, undertook to kill his well, obviously without success, by pumping water and thereafter baroid into it. After such efforts there still remained a surface pressure of 950 pounds per square inch in said well. In August, 1943, this well cratered, blowing large quantities of surface soil 150 to 200 feet in the air which formed a ramp about the well head when it descended. On August 30, 1943, the well caught on fire and was still burning at the time of the trial hereof on February 21, 1944, at which time the crater covered several acres. On August 30, 1943, the Commission again ordered Corzelius "to proceed at once to put the fire out * * * and to rework said well in such a manner as to bring it under control and put it back on production." Corzelius was unable to extinguish the fire and sought to relieve the gas pressure in the shallow sands in the vicinity of his well by drilling six relief wells, all to no avail, and in one of them the entire drilling rig disappeared into the hole and was lost.

Meantime, following the cratering of the Corzelius well on August 30, 1943, the shallow sands beneath the surrounding area continued to be surcharged with gas in increasing quantities, and the area so permeated by high gas pressures steadily expanded radially from the Corzelius well until by October 20, 1943, practically all wells over a large area, including relief wells, water wells and five of Harrell's producing gas wells had cratered, and said five Harrell gas wells had to be killed. There was no cratering of any wells until after the Corzelius well cratered. Water wells became geysers, one located approximately 2 miles from the Corzelius well throwing water 80 to 100 feet into the air. Others cratered and emitted gas which caught on fire. Gas seepage and surface blowouts occurred on farms and in the vicinity of some 60 or 70 homes, crops were destroyed, homes and farms were endangered, and one entire farm had to be abandoned. Fissures were formed over one farm 4,500 feet from said well through which gas escaped and when ignited continued to burn.

The testimony showed that the flames of the burning Corzelius well varied in height from 40 or 50 feet down to only a few feet, due, in the opinion of witnesses, to bridging down in the well. That when such flames were high gas pressure in the shallow sands in the surrounding area was diminished; but that when they were low such pressure in the same area proportionately increased within a short time. From these facts and circumstances the Railroad Commission was clearly authorized to conclude that such conditions were caused by leakage from the Corzelius well; and on October 20, 1943, ordered Corzelius to commence immediately the drilling of a directional well to kill the burning well. His failure or inability to do so resulted in the issuance by the Commission of the order herein attacked.

It cannot be gainsaid that in addition to the imminent hazards to life and property so created, enormous waste of the material resources of the State was taking place. An estimated 8 billion cubic feet of gas had been lost, not including the condensate that might have been extracted therefrom. Harrell had been forced to kill 5 of his producing wells; and the average bottom hole pressure of the field had been lowered approximately 300 pounds per square inch between July, 1943, and February, 1944, approximately 3 times as rapidly as had occurred in the six months immediately prior to July, 1943. With this general statement of the situation presented, we turn now to contentions made by appellant.

The first point presented is that drilling a directional well surfaced on Harrell's property and to be bottomed, by divergence from a vertical course, underneath appellant's land, constitutes a trespass upon appellant's property which the Commission had no authority to commit either itself or through an agent. This on the ground that the powers granted to the Commission by the conservation laws are in derogation of the common law, with authority to invoke penalties against property owners for violation of Commission orders, must be strictly construed, and that such conservation

statutes nowhere give the Commission express authority to enter and enforce such an order as the one here in controversy.

We do not understand the appellant to deny that enormous waste of one of the natural resources of the State was taking place; nor that same constituted a violation of the statutes themselves and of the orders of the Railroad Commission; nor that the statutes (Title 102, R.C.S., Vernon's Ann.Civ.St. art. 6004 et seq.) impose upon the Commission the mandatory duty of waste prevention as therein defined. We quote from appellant's brief: "The question presented is not whether the Commission *can* control such waste; the question is *How* can the Commission prevent it?" The contention being that since the conservation statutes provide heavy penalties against persons who violate them or who violate the valid orders of the Commission, enforceable through penalty suits by the Attorney General; provide that the Commission may enforce its orders through judicial processes, by injunction or other adequate remedy (Art. 6008, Sec. 23, Art. 6023, V.C.S.); and in extreme cases (V. C.S. Art. 6049e, Sec. 13) authorize the Commission to have a receiver appointed by a court of competent jurisdiction to take over the property of a producer in order to enforce its orders; then that under established rules of construction the Commission is confined exclusively to the above indicated procedure in preventing waste. In other words, that since no statute expressly authorizes the Commission to prevent waste through the method undertaken in the instant case, such method cannot be employed by it.

The general rule is well settled that boards or commissions which are creatures of the statutes, can exercise only such authority as is conferred upon them by law in clear and express language and that authority will not be construed as being conferred by implication. The latest pronouncement of this rule of construction appears in Board of Ins. Com'rs v. Guardian Life Ins. Co., 180 S.W.2d 906. See also Humble Oil & Refining Co. v. Railroad Comm., 133 Tex. 330, 128 S.W.2d 9; Ortiz Oil Co. v. Railroad Comm., Tex.Civ. App., 62 S.W.2d 376; Commercial Standard Ins. Co. v. Board of Ins. Com'rs, Tex. Civ.App., 34 S.W.2d 343, writ refused. It is equally well settled, however, that when a statute imposes a mandatory duty upon a governmental agency to carry out the express and specifically defined purposes and objectives stated in the law, such statute carries with it by necessary implication the authority to do whatever is reasonably necessary to effectuate the legislative mandate and purpose. 39 Tex.Jur. Sec. 99, p. 186; 50 Am.Jur. Sec. 428, p. 449. It is not necessary to here set out the various statutes defining waste. Suffice it to say that the conditions prevailing in the Corzelius well, and permitted by him to continue (whether as a result of his inability or of his refusal to correct them) constituted not only enormous waste of natural resources in violation both of the conservation laws and of the orders of the Commission; but also a continuing and increasing hazard to the lives and property of all the people over a wide area around the well in question. After the well had cratered and caught on fire it then became impossible to kill it through its own well bore. According to the evidence the only way to do so was by drilling a directional well to the vicinity of the bottom of the well in question and through such directional well to stop the flow of gas. into and through the Corzelius well. This. necessitated considerable time and the expenditure of approximately $100,000. Corzelius had expended approximately $71,000; without avail in his efforts to bring his well under control. He had been directed by the Commission on October 20, 1943, to drill' a directional well for that purpose, but apparently for financial reasons or otherwise had been unable to do so. The Commission was thus confronted with conditions which: not only constituted several types of waste as defined by statute; but also were becoming increasingly more aggravated, dangerous to lives and property, and which, unless brought under control, might readily result in a public catastrophe. These matters should be considered in passing upon the powers granted by law to the Commission to cope with the situation so confronting it.

The conservation laws (Title 102, V.C.S.), though specific in many particulars, are clearly intended to prevent all waste of the natural resources of the State, whether specifically therein defined or not; and to impose upon the Railroad Commission the mandatory duty of carrying out the legislative intent. The statutes themselves negative any intent of the legislature to limit the Commission to the powers. and duties specifically enumerated therein.. Art. 6008, Sec. 6 provides that "The Com-

mission shall *make* and *enforce* rules, regulations, or orders for the conservation of natural gas, to prevent the waste thereof, and *otherwise* to accomplish the purposes of this Article, *including* rules, regulations, or orders for the following purposes."

Here follows specific enumerated powers and duties. Paragraph (7) of the same section directs the Commission: "To provide for the issuance of permits, and other evidences of permission when the issuance of such permits, or permission is necessary or incident to the enforcement of its *blanket grant of authority* to make *any* rules *necessary* to effectuate the law." (Italics ours.) Sec. 22 of this Article provides: "The Commission shall be vested with a broad discretion in administering this law, and to that end shall be authorized to adopt *any and all* rules, regulations or orders which it finds are necessary to effectuate the provisions and purposes of said law."

Art. 6029 relating to the conservation of both oil and gas contains substantially the same provisions. And Art. 6046 provides that: "The Commission, when necessary, shall make and enforce rules and regulations either general in their nature or applicable to particular oil fields for the prevention of actual waste of oil or operations in the field dangerous to life or property."

Latitude of the Commission in dealing with specific fact situations so as to effectively administer the conservation laws is not only contemplated by the laws themselves, but has been recognized by the courts. As stated by the Supreme Court in Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 938, 99 A.L.R. 1107, on rehearing 87 S.W.2d 1069, 101 A.L.R. 1393, "It is utterly impossible for the Legislature to meet the demands of every detail in the passage of laws relating to the production of oil and gas. * * * This duty is placed on the Railroad Commission." In Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73, 85, that court again stated: "We must remember that the machinery of our oil and gas conservation statutes would not work if it were not allowed a little play in its joints." Similar recognition is to be found in Webster v. Texas & P. Motor Transport Co., 140 Tex. 131, 166 S.W.2d 75; Railroad Comm. v. Wencker, 140 Tex. 527, 168 S.W.2d 625; and Marrs et al. v. Railroad Comm., Tex. Sup., 177 S.W.2d 941. As early as 1932, this court, in considering this question, held in Danciger Oil & Refining Co. v. Railroad Comm., 49 S.W.2d 837, 841, that: "Any order of the commission bearing a reasonable relationship to the general duty imposed upon the commission, which is not unreasonable nor unjust, and which is reasonably calculated to prevent waste, comes, if not within the express powers granted to the commission, clearly within those necessarily implied; and is 'confined to the obvious purposes and directions of the statute'." Further in the same case that "To say that we must look to the statute for every method or standard of regulation by which the commission could act in preventing such waste would be to nullify the conservation laws."

■ In the light of the above cited statutes and decisions, so long as the Commission acts fairly, impartially and not unreasonably it has the authority to enter such order as is reasonably necessary to prevent waste, fire hazards and abate an imminent danger to life and property. We attach no controlling importance to the provision of the order designating Harrell as agent of the Commission. Even if it be conceded that the Commission had no authority to make him its agent, the order "authorizing" him to drill such well was, in its overall aspect, in the nature of a permit to do so, not only to stop waste already taking place, but for the protection and preservation of his own property. The same is true with reference to the drilling thereof under the supervision of the Commission. Under the conservation laws and rules of the Commission the drilling of such well would have been under the potential and general supervision of the Commission whether the order had so stated or not. The evidence showed that the only way, under the circumstances, to kill the wild well and to cope with the situation was by drilling the authorized directional well. That being true, the Commission in carrying out both the constitutional and statutory mandates, had the authority, in our opinion, upon failure of Corzelius to do so after being so ordered, to authorize someone capable of doing so, to enter upon his premises either above or below the surface in order to extinguish the fire, bring the well under control, or kill it if necessary to stop such waste. Every restriction and limitation made by law and valid regulations upon the use by the owner of his property, such as spacing of wells, refusal of permits to drill same, proration of production

therefrom, compulsory shutdowns, etc., are in derogation of the common law rights of the owner to use his property as he sees fit. But it is long since settled that the public has an interest in the natural resources of the State; that the production of oil and gas is affected with a public interest, and are subject to any reasonable regulation necessary to conserve them. Granted the power to regulate, the reasonableness of the steps taken must, of necessity, depend in large measure upon the facts and circumstances calling for such action.

■ We think the order attacked is valid for another reason. It authorizes Harrell to enter, beneath the surface, upon appellant's property to abate not only what the evidence shows to be a public and private nuisance, but to protect his property and the property and lives of those residing in the area from threatened destruction. The Corzelius well, afire and uncontrolled, was potentially of the nature of a conflagration endangering the entire vicinity, threatening both public and private mischief. As such it made applicable the maxim "Salus populi suprema est lex." The destruction of private property, if necessary to prevent spread of a conflagration is warranted. Keller v. Corpus Christi, 50 Tex. 614, 32 Am.Rep. 613. The same is true if necessary to destroy property to prevent floods, pestilence or the spread of disease. A dog that has gone mad or a horse that has developed a fatal contagious disease may be summarily destroyed. In Davenport v. East Texas Refining Co., Tex.Civ.App., 127 S.W.2d 312, 316, the court held that 200,000 barrels of inflammable oil which had flowed into a creek "loose and afloat upon flooded streams was comparable to a mad dog loose in the community which called for action then and there." A more serious situation is here presented and Harrell, for the protection of his own property, and of the lives and property of the residents of the vicinity, had a right, with the approval of the Commission, to abate the nuisance. 31 Tex.Jur., p. 442; 39 Am.Jur., pp. 467–469.

■ Nor was the Commission limited, in the enforcement of its orders, as contended by appellant, to a resort exclusively in the instant case to penalty suits, or to injunctions against Corzelius for violation of its orders; or to the appointment of a receiver, as authorized by Sec. 12, Art. 6049c, and Sec. 13 of Art. 6049e, to take over the property of the appellant, bring the well under control, charge the expense thereof against the owner and make same a lien on his property. An emergency which brooked the least possible delay was presented, and it does not appear that either penalty suits or injunctions would extinguish the burning well or otherwise provide an adequate remedy. The evidence indicated that Corzelius's property was already subject to a mortgage for about $430,000. It is doubtful if a receiver, had one been appointed, could have obtained as a charge against the property the $100,000 necessary to drill the directional well. Apparently Corzelius was unable to do so. Certainly he is in no position to complain that Harrell, for the protection of his own property, is willing to drill such well at his own expense, in order to accomplish that which was the primary duty of Corzelius to do at the latter's expense. In brief, if the only practical and reasonable way to prevent such waste was to kill the Corzelius well by the drilling of a directional well for that purpose, as the Railroad Commission found, and to do so required the entry below the surface upon Corzelius's property, the Commission had, under the conservation laws, the power to authorize such entry. And being authorized by law such entry did not constitute a trespass.

■ The second point urged by appellant is that even if the Commission had the right to enter upon appellant's premises to prevent waste, it had no authority to authorize Harrell, a private individual, to do so. This on the ground that Sec. 18 of Art. 6049c requires that "All persons entrusted with the enforcement of the orders, rules, and regulations of the Commission shall be regular employees of the State of Texas and paid by the State of Texas * * *." Obviously this statute, in so far as it relates to drilling permits, applies only to officers and employees of the Commission charged with supervision of such drilling. While a permit is in a sense an order it does not require the permittee to drill such a well. The Commission clearly has no authority to drill wells as an agency of the State; nor has the Legislature made any appropriation to pay for drilling any such wells. The Commission could not compel Harrell to drill such well at his own expense, and did not undertake to do so. It merely gave him authority to do so. Merely designating him as an agent of the Commission did not detract from that authority. The validity of that portion of the order

directing him, upon completion of the directional well, to attempt to kill the Corzelius well, was an issue which Harrell might be in a position to raise, but he has not complained of it. Clearly, we think, Corzelius could not complain of it.

The Commission urges that it had the authority under the provisions of Art. 6032c—2 to designate some suitable person to perform the services set forth in Art. 6005 and to collect from the owner or operator of the well the costs of such services. Art. 6005 requires the owner or operator of a well "when about to abandon or cease operating the same and before drawing the casing therefrom" to plug the well in the manner therein described so as to prevent the escape of oil and gas therefrom. It is not believed, however, that the situation here presented brings the Corzelius well within the meaning of Art. 6005. That Article, in our opinion, had reference to voluntary abandonment by the owner or operator of a well, usually where it has ceased to produce in paying quantities; and was intended to insure protection of the oil and gas sands against damage in such cases. While the Supreme Court in Railroad Comm. v. Gulf Production Co., 134 Tex. 122, 132 S.W.2d 254, held that the Commission could consider a well, illegally drilled, where the court, on that ground, had enjoined production therefrom, as an abandoned well under the statute and as such had jurisdiction to order it plugged; that case is not analogous to the situation here presented. The Corzelius well was legally drilled and had never ceased to produce. It had got beyond his control and because of the high gas pressure a condition had developed which he was apparently unable to cope with. There is no indication that he had, within the meaning of Art. 6005, abandoned such well or intended to do so. On the contrary he is opposing any such course. Consequently the provisions of Arts. 6005 and 6032c—2 would not, in our opinion, be applicable. But as stated above, the mere fact that Harrell was designated as the agent of the Commission would not invalidate the permit granted him to drill the directional well, nor deprive the Commission of the authority to do, by appropriate order, whatever was reasonably necessary, after such well is drilled, to prevent waste, eliminate fire hazards and bring such well under control, or have it killed entirely if that were necessary.

Appellant's third and last point is that the order in question is invalid under the due process provisions of the State and U. S. Constitutions, Vernon's Ann.St.Const. art. 1, § 19; Const.U.S. Amend. 14; and under Art. 6036a, V.C.S. because entered without adequate notice and hearing. This point is not sustained. The record affirmatively shows several hearings had been held by the Commission concerning conditions in the Bammel field and particularly with reference to appellant's well after August 30, 1943. The order of the Commission dated November 19, 1943, recites notice of such hearing issued on November 6, 1943. The order here under attack recites notice given, and the record contains a copy of such notice issued on January 17, 1944, of the hearing to be held on January 28, 1944. It is not denied that appellant was represented by counsel at both of these hearings. Even if it be conceded that adequate notice of the January 28th hearing was not brought to appellant; under the statute (Art. 6036a) and the decisions, the order attacked would have been authorized even without additional hearing. The order of January 31, 1944, dealt with the same subject matter as did the order of November 19, 1943, and was in effect but a modification or amendment of the latter which was entered after a hearing. It was therefore authorized "without prior notice." Art. 6036a; State v. Blue Diamond Oil Corp., Tex.Civ.App., 76 S.W.2d 852, 853; Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73. Under the rule announced by the Supreme Court in Cook Drilling Co. v. Gulf Oil Corp., 139 Tex. 80, 161 S.W.2d 1035, if a full hearing of the facts be had in the district court, and that hearing discloses that facts existed, at the time the order attacked was issued, sufficient to justify the entry of such order, then it becomes immaterial whether the Commission heard sufficient evidence to sustain the order or not. That being true, and appellant having been given a full hearing upon the trial hereof, and the evidence on such trial showing that ample grounds existed both on November 19, 1943, and January 31, 1944, to sustain such orders, appellant was not injured.

Finding no error in the record which materially affects the substantial rights of the appellant, the judgment of the trial court is affirmed.

Affirmed.