# Supreme Court of Texas

No. 20-0811

University of Texas at Austin President Jay Hartzell, et al.,

*Petitioners,*

v.

S.O.,

*Respondent*

On Petition for Review from the
Court of Appeals for the Third District of Texas

*~ consolidated for oral argument with ~*

No. 20-0812

Texas State University President Denise M. Trauth, et al.,

*Petitioners,*

v.

K.E.,

*Respondent*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued September 20, 2022**

JUSTICE LEHRMANN delivered the opinion of the Court, in which Chief Justice Hecht, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined.

JUSTICE BOYD filed an opinion concurring in the judgment.

JUSTICE BLACKLOCK filed a dissenting opinion, in which Justice Devine joined.

The principal issue in these two ultra vires suits, which we consolidated for oral argument, is whether state university officials have the statutory authority to revoke a former student's degree upon concluding that the former student engaged in academic misconduct in pursuit of that degree. The same court of appeals held in both suits that no such authority exists and affirmed the trial courts' denials of the university officials' jurisdictional pleas as to the pertinent claims. We disagree and reverse those portions of the court's judgments. Because no other claims remain pending in 20-0811, we dismiss that case for lack of jurisdiction. However, we agree with the court of appeals that the due-process claims in 20-0812 may continue. Accordingly, we affirm that judgment in part and remand the case to the trial court for further proceedings.

## I. Background

### A. 20-0812

K.E. is a former graduate student at Texas State University. She enrolled in the doctoral program of the University's biology department in 2006. Her dissertation involved analyzing data collected in the field

2

using a leaf gas analyzer called a LiCor instrument.  K.E. presented and successfully defended her dissertation, and in May 2011 the University conferred on K.E. a Doctor of Philosophy (Ph.D.) with a major in aquatic resources.

After K.E. graduated, while she and her doctoral advisor were collaborating on a journal article, the advisor found inconsistencies in K.E.'s dissertation research data that led the advisor to believe K.E. had manipulated the data.  Unsatisfied with K.E.'s explanations for both the discrepancies and some missing original LiCor data files, the advisor notified Dr. Michael Blanda, Assistant Vice President for Research and Federal Relations, of her suspicion that K.E. had falsified the data and the basis for that suspicion.  K.E. submitted a response to Dr. Blanda through her attorney.  Based on those submissions, the University commenced an investigation into the advisor's allegations of academic misconduct.  That investigation proceeded as follows:

- Dr. Blanda appointed a three-member Committee of Inquiry.
- The committee held a meeting with K.E., whose attorney and forensic expert were present.  K.E. submitted additional documentation to the committee after the meeting.
- The committee submitted a detailed report recommending a full investigation, and K.E. submitted a written response to the report.
- Based on those submissions, the University formally charged K.E. with "misconduct in research and scholarship" while a student at the University.
- K.E. was sent written notice of the formal charges, the procedures to be followed by the three-member Investigating Committee, and K.E.'s right to appeal.
- The Investigating Committee conducted a two-day hearing with a court reporter present.  K.E. was represented by

3

counsel, called witnesses, cross-examined witnesses, and submitted written documents for the committee's consideration.

- The Investigating Committee found by a preponderance of the evidence that K.E. committed misconduct in research and scholarship by falsifying and fabricating data in her dissertation, and it recommended that the University revoke her Ph.D.

- K.E. appealed the findings to University President Denise M. Trauth, who affirmed the decision and recommended to the Texas State University System Board of Regents that it revoke K.E.'s degree at its quarterly meeting.

- K.E. submitted a written dispute of the recommendation to the Board, and at her attorney's request the Board heard the appeal in executive session.

- The Board affirmed Trauth's recommendation to revoke K.E.'s degree.

Following the Board's action, Trauth notified K.E. that a notation of that action had been placed on her transcript, and Trauth requested that K.E. cease representing herself as holding a Ph.D. from the University and return her doctoral diploma to the registrar. K.E. then sued Trauth, Blanda, the registrar, and the members of the Board of Regents in their official capacities.[1] In her live pleading, she asserted ultra vires claims against the University officials based on their alleged lack of authority to revoke her degree. She further claimed that the process the University officials employed to revoke the degree did not

---

[1] K.E. sued several other defendants that she later nonsuited.

4

afford her due course of law under the Texas Constitution.[2] She sought declaratory and injunctive relief, including an order requiring the University officials to reinstate her degree.[3]

The University officials filed a plea to the jurisdiction on sovereign-immunity grounds, arguing that they had legal authority to revoke K.E.'s degree for cause and that K.E. failed to plead a viable constitutional claim in light of the process she was afforded. In response, K.E. asserted that Texas law does not authorize revocation of her degree "outside of a court of competent jurisdiction" and that the University officials must seek contractual remedies in court "because a Ph.D. is a protected property and liberty interest." She alternatively argued that, even if the University officials had authority to revoke her degree, she was subjected to "fundamentally flawed proceedings" that

---

[2] Specifically, K.E. alleged that: the degree-revocation process was "conducted in an *ad hoc* manner" that did not give her adequate notice as to how the proceedings against her would be handled; two of the three members of the Investigating Committee were not impartial, or at least their presence created the appearance of impropriety; the University "failed to preserve forensically sound evidence and have in place a coherent system to centralize the data that was at issue in this case"; the burden of proof—preponderance of the evidence—was too low; the hearing included no criteria for the admissibility of evidence; and the appellate review process was insufficient.

[3] In addition to declarations that the University officials lacked authority to revoke her degree and violated her due-process rights, K.E. sought declarations that: the 2006 University Catalog in effect when K.E. was a graduate student constitutes a binding contract with the University; the provisions of that catalog governing disciplinary procedures are unconstitutional; and the University may not enforce any rules amended, modified, or adopted after she graduated. The court of appeals did not discuss these specific requests, nor do the parties independently address them in this Court. Accordingly, neither will we.

denied her due course of law. The trial court denied the plea, and the University officials appealed. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (authorizing an interlocutory appeal from an order that grants or denies a governmental unit's plea to the jurisdiction).

A divided court of appeals affirmed, holding that K.E.'s pleadings alleged an ultra vires claim against the University officials that was not barred by sovereign immunity. 613 S.W.3d 222, 232 (Tex. App.—Austin 2020). Examining the statutes governing the Texas State University System, the court of appeals held that they neither expressly nor impliedly authorize revocation of a student's degree after it has been conferred. *Id.* at 228–31.[4] The court also rejected the University officials' argument that K.E. sought only retrospective relief, which would foreclose an otherwise proper ultra vires claim. *Id.* at 231–32. Justice Kelly dissented, opining that the Board "has the authority to revoke a former student's degree for academic dishonesty so long as, as relevant here, it affords due process under the United States Constitution and due course of law under the Texas Constitution." *Id.* at 233 (Kelly, J., dissenting).

### B. 20-0811

S.O. enrolled in The University of Texas in 2003 as a graduate student working toward a Ph.D. in chemistry. Her dissertation research involved efforts to develop multistep synthetic routes to natural products, including lundurine products. S.O. presented and successfully

---

[4] The court of appeals did not address the University officials' argument that K.E. failed to plead a valid constitutional claim.

defended her dissertation, and in May 2008 the University conferred on S.O. a Ph.D.

In 2012, S.O.'s graduate advisor, Professor Stephen Martin, brought a complaint against her for academic misconduct relating to some of the data reported in her dissertation.[5] The University formed a committee to investigate the allegations, and the committee concluded 2–1 that S.O. engaged in scientific misconduct. The committee's findings were referred to S.O.'s dissertation committee to, "at a minimum, ensure that the dissertation reflects the actual results of her research." With one member declining to participate, the dissertation committee determined that S.O.'s degree was improperly awarded and should be revoked. According to S.O., she "was not accorded notice of the cause or causes presented to the dissertation committee," "was not provided with the materials that the dissertation committee considered in reaching its decision," and "was not provided the opportunity to be heard by the dissertation committee to address and defend the integrity of her dissertation."

In February 2014, S.O. was informed of the decision to revoke her degree and immediately filed suit, alleging that the University's actions violated her constitutional rights and seeking a temporary restraining

---

[5] According to S.O.'s petition, in 2011, Martin submitted a journal article for publication that used S.O.'s research as well as a post-doctoral researcher's related work; Martin was listed as lead author, and S.O. and the post-doc were listed as co-authors. Another graduate student later conducted experiments indicating that some of the reported data in the article were inaccurate, ultimately leading Martin to retract the article and make the complaint against S.O.

order to prevent any disciplinary action against her. Before the TRO hearing, the parties entered into a Rule 11 agreement specifying that the University would restore S.O.'s degree while the parties discussed "additional process." Shortly thereafter, the University notified S.O. that it was initiating the student-discipline process to address the investigative committee's findings and the dissertation committee's subsequent recommendation. Included with the notice was a copy of the University's rules pertaining to student conduct and discipline. The University then filed a plea to the jurisdiction on mootness grounds, the trial court granted the plea, and the court of appeals affirmed. *[S.O.] v. Univ. of Tex. at Austin*, No. 03-14-00299-CV, 2015 WL 5666200, at \*5 (Tex. App.—Austin Sept. 23, 2015, no pet.).

The University subsequently notified S.O. that a disciplinary hearing was scheduled for January 29, 2016. The notice stated that S.O. was charged with violating sections of the Board of Regents' and the University's Rules and Regulations governing academic dishonesty based on allegations that she "falsified data and modified Nuclear Magnetic Resonance (NMR) spectra" by "underreporting and misreporting NMR signals for three compounds . . . in [her] doctoral dissertation." The information contained in the notice included:

- an advisory that S.O. was entitled to a private hearing, to appear in person and have an advisor present, to challenge the persons designated to hear the charges, to know the identity of adverse witnesses and to cross-examine those witnesses, to present witnesses and evidence on her own behalf, and to appeal under Section 11-804 of the University's Institutional Rules;

8

- the identity of the members of the Student Conduct Board Panel designated to hear the charges and S.O.'s right to challenge any of the members for lack of fairness or objectivity;

- the identity of the witnesses the University may call to testify;

- a list of the documentary evidence the University may furnish in the proceeding; and

- the deadline for S.O. to furnish the Dean of Students with a list of witnesses who would testify on her behalf and copies of evidence she would offer at the hearing.

After the hearing was rescheduled for March 4, 2016, S.O. filed this suit against several University officials for declaratory and injunctive relief.[6]  In pertinent part, S.O. sought declarations that the officials "are not authorized to revoke a degree" and that the University's rules governing disciplinary proceedings do not satisfy due process.  She also sought an injunction preventing the University from proceeding with the disciplinary hearing.  The University officials responded with a plea to the jurisdiction.  After a combined hearing, the trial court entered an agreed order providing that the disciplinary hearing would be held before a single hearing officer and that "Defendants will abate any formal action resulting from a decision in the disciplinary process for thirty (30) days to provide Plaintiff an opportunity to request additional injunctive relief, should she choose to do so, at the conclusion of the internal appeal of the disciplinary process."  The court expressly reserved ruling on the plea to the jurisdiction.

---

[6] The named defendants in S.O.'s live pleading, all sued in their official capacities, are the President of the University, the University Registrar, the Dean of Students, and the members of the UT System's Board of Regents.

9

The disciplinary hearing was rescheduled several times but ultimately never commenced. As a result, in October 2016 the trial court granted the University officials' plea to the jurisdiction on the ground that S.O.'s claims were not ripe for review. The court of appeals reversed in part, holding that a justiciable controversy exists with respect to S.O.'s claim for a declaratory judgment that the University officials are acting ultra vires because they lack authority to revoke her degree. *S.O. v. Fenves*, No. 03-16-00726-CV, 2017 WL 2628072, at *4 (Tex. App.—Austin June 15, 2017, no pet.).

On remand, S.O. filed an amended petition seeking several declarations, including declarations that the University officials lack express or implied authority to revoke a former student's degree.[7] She also filed a motion for summary judgment, arguing that she was entitled to the requested declaratory relief as a matter of law. The University officials responded with a second plea to the jurisdiction, arguing that they "have implied authority to revoke a diploma that a student obtains in violation of their Institutional Rules, as long as [they] afford adequate due process." The officials contended that S.O.'s other claims for declaratory relief were also barred by sovereign immunity.

---

[7] S.O. also requested declarations that S.O. has a constitutionally protected property and liberty interest in her Ph.D.; the 2003 University Catalog in effect when S.O. was a graduate student constitutes a binding contract with the University; enforcement against S.O. of any rules amended, modified, or adopted after she graduated would be unconstitutional; and the 2003 University Catalog as written for disciplinary proceedings is unconstitutional because it does not satisfy due process or provide S.O. equal protection under the law.

10

The trial court denied the plea to the jurisdiction "as to [S.O.'s] ultra vires claim regarding whether [the officials] are acting without authority to revoke a degree" but granted the plea as to all other claims for relief. The trial court also granted S.O.'s motion for summary judgment as to the requests for a declaratory judgment that the officials lack express and implied authority to revoke her degree. Finally, the trial court denied S.O.'s motion for attorney's fees.

As in 20-0812, the same divided court of appeals affirmed, holding that S.O. asserted a cognizable ultra vires claim against the University officials—specifically, that they acted without legal authority by instituting an internal proceeding to decide whether to revoke her degree—that is not barred by sovereign immunity. 613 S.W.3d 244, 256 (Tex. App.—Austin 2020). Examining the statutes governing The University of Texas System, the court of appeals held that they neither expressly nor impliedly authorize revocation of a student's degree after it has been conferred. *Id.* at 253–56. The court also rejected the University officials' contention that the ultra vires claims are not ripe unless and until S.O.'s degree is revoked. *Id.* at 256–58.[8] Justice Kelly

---

[8] S.O. argued on cross-appeal that the trial court abused its discretion in failing to award her attorney's fees and erred in denying her motion for summary judgment on the two requests for declaratory relief involving whether the 2003 University Catalog was a binding contract with the University and whether the University could enforce against S.O. any disciplinary rules enacted or amended after her graduation. The court of appeals overruled both issues, 613 S.W.3d at 259–60, and S.O. does not seek review of those rulings in this Court. As to the trial court's grant of the University officials' plea to the jurisdiction on S.O.'s constitutional claims, S.O. did not challenge those portions of the trial court's judgment in the court of

11

again dissented, opining that the System's Board of Regents "has the authority to revoke a former student's degree for academic dishonesty so long as, as relevant here, it affords due process under the United States Constitution and due course of law under the Texas Constitution." *Id.* at 260–61 (Kelly, J., dissenting). The dissent also agreed with the University officials that S.O.'s claims regarding the officials' authority to revoke her degree are unripe. *Id.* at 261.

We granted the University officials' petitions for review in both 20-0811 and 20-0812 and consolidated the cases for oral argument.

## II. Ultra Vires Framework

Although sovereign immunity generally bars lawsuits against state officials acting in their official capacities, the doctrine does not apply to suits seeking to require such officials to comply with the law. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). To maintain an ultra vires suit, the claimant must "allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* On meeting that burden, the claimant is entitled to "prospective injunctive relief, as measured from the date of injunction." *Id.* at 376. Retrospective relief, however, remains barred by immunity absent a legislative waiver. *Id.* at 376–77. Whether a claimant has alleged a valid ultra vires claim is a question of law that we review de novo. *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 929 (Tex. 2010).

---

appeals, which recognized that the constitutional claims were not before it. *Id.* at 252 n.5.

## III. Statutory Authority

The University officials, as officials of the Texas State University System and Texas State University (20-0812) and of The University of Texas System and The University of Texas at Austin (20-0811), derive their "legal authority" from the statutes establishing and governing the Systems and their component institutions. The Systems in turn may exercise "powers that the Texas Legislature has expressly conferred upon [them] and those implied powers that are reasonably necessary to carry out [their] statutory duties." *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017) (generally describing the scope of a state administrative agency's authority). Relatedly, they may adopt rules that "are authorized by and consistent with [their] statutory authority." *Id.* (citations omitted). However, they may not "erect and exercise . . . a new and additional power or one that contradicts the statute, no matter that the new power is viewed as being expedient for administrative purposes." *Pub. Util. Comm'n of Tex. v. GTE-Sw., Inc.*, 901 S.W.2d 401, 407 (Tex. 1995).

### A. Governing Statutes and Board Rules

The Texas Education Code grants expansive authority to public institutions of higher education and their governing boards to manage their affairs and meet their educational obligations. Generally speaking, a governing board "is expected to preserve institutional independence," "shall enhance the public image of each institution under its governance," and "shall nurture each institution under its governance to the end that each institution achieves its full potential within its role and mission." TEX. EDUC. CODE § 51.352(a)(1), (2), (4).

13

Further, "each institution of higher education has the general responsibility to serve the public and, within the institution's role and mission to," among other things, "provide for scientific, engineering, medical, and other academic research;" "protect intellectual exploration and academic freedom;" and "strive for intellectual excellence." *Id.* § 51.354(4)–(6).

Other statutes apply to specific university systems and their respective component institutions. Relevant here, the Education Code vests the "organization, control, and management" of the Texas State University System in a nine-member Board of Regents. *Id.* § 95.01. The Texas State Board "is responsible for the general control and management of the universities in the system and may erect, equip, and repair buildings; purchase libraries, furniture, apparatus, fuel, and other necessary supplies; employ and discharge . . . employees; fix the salaries of the persons employed; and perform such other acts as in the judgment of the board contribute to the development of the universities in the system or the welfare of their students." *Id.* § 95.21(a). In carrying out that responsibility, the Board may "promulgate and enforce such rules, regulations, and orders for the operation, control, and management of the university system and its institutions as the board may deem either necessary or desirable." *Id.* § 95.21(b). Among other powers, the Board "may determine the conditions on which students may be admitted to the universities, the grades of certificates issued, the conditions for the award of certificates and diplomas, and the authority by which certificates and diplomas are signed." *Id.* § 95.24.

Similarly, the Education Code vests the government of the UT System in a nine-member Board of Regents. *Id.* § 65.11. The UT Board "is authorized and directed to govern, operate, support, and maintain each of the [System's] component institutions"; "to prescribe for each of the component institutions courses and programs leading to such degrees as are customarily offered in outstanding American universities"; and "to award all such degrees." *Id.* § 65.31(a)–(b). In carrying out those responsibilities, the Board may "promulgate and enforce such other rules and regulations for the operation, control, and management of the university system and the component institutions thereof as the board may deem either necessary or desirable." *Id.* § 65.31(c).

Exercising their authority to delegate a power or duty to a designated agent, *id.* §§ 65.31(g), 95.21(b), the UT and Texas State Boards adopted rules relevant to these proceedings. The Texas State System's rules delegate to the president of each component institution "authority to grant degrees, certificates and diplomas upon the recommendation of the respective faculty, deans, and provosts." Tex. State Univ. Sys., *Rules and Regulations*, ch. 1, ¶ 2.41 (amended 2019). The rules also expressly govern degree revocation in cases of "fraud, mistake, or academic dishonesty":

> Revocation. The Board hereby provides notice that the granting of any degrees, certificates or diplomas is specifically conditioned upon the truth of representations made by the student in the admission process and also upon honesty in completion of his or her academic work. When the Board determines that a degree, certificate, diploma, or admission to the institution and/or the academic program was obtained through fraud, mistake, or

15

academic dishonesty, the Board may revoke the degree, certificate, or diploma, provided the Component has afforded the degree, certificate, or diploma recipient due process of law.

*Id.* ¶ 2.42 (amended 2019).[9]

The UT System's rules direct each of the System's component institutions to adopt rules and regulations governing student conduct and discipline in accordance with a model policy. *See* Univ. of Tex. Sys., *Rules and Regulations of the Board of Regents, Rule 50101: Student Conduct and Discipline* (amended 2017). The University adopted such rules, which include detailed provisions governing student disciplinary proceedings. One of the authorized disciplinary sanctions is "revocation of degree or withdrawal of diploma," which "may be imposed when the violation involves academic dishonesty or otherwise calls into question the integrity of the work required for the degree."[10]

## B. Analysis

In concluding that the above-described statutes do not authorize the Boards to revoke a former student's degree, the court of appeals first held in *K.E.* that Section 95.21's broad grant of authority with respect to "the operation, control, and management" of the Texas State System and its component institutions, construed in and limited by its context,

---

[9] At the time of the administrative proceedings against K.E., the pertinent rules were numbered 2.31 and 2.32, but they were substantively identical to the rules currently in effect.

[10] The rules in effect when S.O. enrolled in 2003 and those in effect when the investigation commenced in 2013 contain essentially identical language with respect to degree revocation.

16

concerns "the day to day operations of the university and the management of its personnel" and thus does not encompass degree-revocation power. 613 S.W.3d at 228–29. Similarly, in *S.O.*, the court of appeals noted that the statute authorizing the UT Board to adopt rules for "the operation, control, and management" of the System and its component institutions "says nothing about the board's authority to discipline a former student." 613 S.W.3d at 253–54. In both cases, the court further rejected the argument that the power to revoke a degree may be implied from the express power to award one, holding that the former is not necessary to accomplish the latter. *Id.* at 255–56; 613 S.W.3d at 230. In so holding, the court of appeals in *K.E.* found persuasive that "the power claimed to be implied necessarily raises . . . substantial constitutional questions regarding due process." 613 S.W.3d at 230.

As an initial matter, we find it helpful to make two clarifying points. First, the court of appeals, as well as K.E. and S.O., conflates to some extent what we view as two independent inquiries. The first is the issue before us—whether the Boards have statutory authority to revoke a previously conferred degree. If so, the second is whether the Boards must afford the former student due process in doing so. But the answer to the latter inquiry has no bearing on the answer to the former.[11] Indeed, there is no real dispute that K.E. and S.O. were entitled to due

___

[11] The dissent similarly focuses on a university degree as intangible property belonging to the recipient. *Post* at 6–7 (Blacklock, J., dissenting). That is certainly relevant to the due-process inquiry, but not the statutory-authority inquiry.

17

process under our precedent.[12] In *University of Texas Medical School v. Than*, we held that the stigma associated with a medical student's dismissal for academic dishonesty implicated a protected liberty interest "that must be afforded procedural due process." 901 S.W.2d 926, 930 (Tex. 1995).[13] A University graduate confronting revocation of her degree for academic misconduct faces similar reputational harm and negative effects on her ability to practice her chosen profession. And although K.E. claims the University's disciplinary procedures failed to satisfy due process, she also asserts the officials lacked authority to revoke her degree regardless of how much process she received. In sum, whether a former student has a constitutionally protected interest in her degree is relevant not to the existence of a university's statutory authority to revoke that degree but to whether the student was presented sufficient notice and opportunity to be heard before that authority was exercised. *See id.* at 931 (holding that, in light of all the surrounding circumstances, the student's due-course-of-law rights were violated by his exclusion from a portion of the evidentiary proceedings against him).

Second, although the effect of K.E.'s and S.O.'s status as former students to whom the Universities had already conferred degrees—as opposed to current students facing expulsion—is at the heart of the

---

[12] In addition, the Texas State Board rule addressing degree revocation expressly requires due process.

[13] By contrast, we have held that a graduate student's dismissal from a state university for *academic* reasons does not carry sufficient stigma to impair a protected liberty interest under the Texas Constitution. *Tex. S. Univ. v. Villareal*, 620 S.W.3d 899, 907 (Tex. 2021).

18

parties' dispute, the University officials rely solely on events that transpired while K.E. and S.O. were students in pursuit of their respective degrees as the basis for revoking those degrees. The University officials do not claim, and for good reason, that they may take such action against K.E., S.O., or any other former student based on conduct occurring after a degree is conferred. Instead, they argue that they may rescind a degree upon determining that it was not earned— and thus should not have been awarded—in the first place. We thus consider only whether the University officials may revoke the degrees of former students who are found to have engaged in academic misconduct while enrolled at the Universities. We hold that they have authority to do so.

As the parties agree, the statutes governing the Systems make no express mention of degree revocation. But they do task the Texas State Board with "the general control and management of the universities in the system," empower the Board to "perform such other acts as in the judgment of the board contribute to the development of the universities in the system or the welfare of their students," and authorize the Board to "determine . . . the conditions for the award of certificates and diplomas." TEX. EDUC. CODE §§ 95.21, .24. Similarly, the statutes authorize the UT Board to "govern, operate, support, and maintain each of the [System's] component institutions"; to prescribe the courses and programs leading to various degrees; and "to award all such degrees." *Id.* § 65.31(a)–(b). And each Board may "promulgate and enforce such rules, regulations, and orders for the operation, control, and management of the university system and its institutions as the board

19

may deem either necessary or desirable." *Id.* § 95.21; *see also id.* § 65.31(c). The language of these provisions, like provisions discussing the powers and duties of other public university systems' governing boards, is expansive and lacking in detail, leaving it to the systems and component institutions to fill in the gaps. *Cf. Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 453 (Tex. 2008) ("When a statute expressly authorizes an agency to regulate an industry, it implies the authority to promulgate rules and regulations necessary to accomplish that purpose."). And as the dissenting justice in the court of appeals noted in *K.E.*, the "heart" of that broad power involves the University's authority to make academic decisions. 613 S.W.3d at 236 (Kelly, J., dissenting).

To that end, the University officials unquestionably and undisputedly have authority under these provisions to enact disciplinary rules and policies regarding academic misconduct and to conclude, upon providing sufficient process, that students who have engaged in such misconduct should be expelled because they do not meet the requisite conditions for the award of a degree. *See Than*, 901 S.W.2d at 929; *Foley v. Benedict*, 55 S.W.2d 805, 809 (Tex. [Comm'n Op.] 1932) ("A student who is admitted to the University receives the privilege of attending that institution subject to the reasonable rules and regulations promulgated by the board of regents and existing at the time of his entrance into the school."). And the only difference between expelling a current student for academic misconduct and revoking the degree of a former student for the exact same academic misconduct is one of timing. That distinction is immaterial to the issue presented and

20

erroneously hinges the university's bare authority to address its students' academic misconduct on when that misconduct is discovered.

Indeed, if timing were as significant as K.E. and S.O. suggest, we struggle to determine when a university passes the point of no return. Is it at the graduation ceremony? When the diploma memorializing the conferral of the degree is printed? When the last box is checked on an administrative form indicating that all requirements have been satisfied? When a doctoral student completes the defense of her dissertation? A degree is not merely a piece of paper; it is a "university's certification to the world at large of the recipient's educational achievement and fulfillment of the institution's standards." *Waliga v. Bd. of Trs. of Kent State Univ.*, 488 N.E.2d 850, 852 (Ohio 1986); *see also Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481, 492 (D. Md. 2015) ("When a school confers credentials, the school places its imprimatur on a student; degrees and credits are a school's implicit endorsement of someone's academic qualifications and personal character, whether they be a current or former student."). Here, the Texas State University officials concluded that K.E. engaged in academic misconduct in pursuit of her degree, such that she did not in fact meet the necessary conditions to be awarded that degree and thus is not entitled to a certification that she did. Their authority to do so, like the authority of the UT officials to make that determination as to S.O. depending on the outcome of the proceedings, fits comfortably within the governing statutes.[14]

---

[14] The University officials argue that the Board rules, which we have held carry "the same force as an 'enactment of legislature,'" confer authority

While precedent on the specific issue presented is nonexistent in Texas and sparse elsewhere, courts applying similarly worded grants of authority have uniformly determined that public universities have degree-revocation power.[15]  For example, in *Waliga*, the Ohio Supreme Court considered whether Kent State University, through its board of trustees, could "revoke improperly awarded degrees" in light of universities' statutory authority to "confer" degrees and "do all things necessary for the proper maintenance and successful and continuous operation of such universities." 488 N.E.2d at 851–52.  Holding that the university could do so "where (1) good cause such as fraud, deceit, or

on the University to revoke a degree independently of the governing statutes. *Hall v. McRaven*, 508 S.W.3d 232, 235 (Tex. 2017) (quoting *Univ. of Hous. v. Barth*, 403 S.W.3d 851, 855 (Tex. 2013)).  We disagree.  The Board cannot by rule grant a power to itself that is outside the authority conferred on the Board by the Legislature.

[15] The dissent finds it telling that the first published opinion specifically addressing this issue was decided relatively recently, in 1986. *See post* at 14 (Blacklock, J., dissenting) ("1986 seems a strange starting point for judicial analysis of the 'traditional and time-honored role' of the governing boards of universities.").  Of course, courts had no reason to opine on whether universities have degree-revocation power until lawsuits were filed alleging that they do not.  Other sources indicate that degree revocation by public universities, based on conduct occurring while the recipient was a student but not discovered until later, is nothing new.  *See* Tex. Att'y Gen. Op. ORD-477, at 3–5 (1987) (addressing requests by the UT System, the Texas A&M University System, and Texas Tech University for an opinion on whether the Open Records Act shielded the identity of individuals whose degrees had been rescinded since January 1, 1977); *Crook v. Baker*, 813 F.2d 88, 91 & n.2 (6th Cir. 1987) (expressing "surprise[] at the dearth of case law dealing with . . . the question whether court action is necessary [to rescind the grant of a degree]" and noting the university's contention "that the record shows that the University of Michigan and many other universities have in fact rescinded the grant of degrees").

error is shown, and (2) the degree-holder is afforded a fair hearing at which he can present evidence and protect his interest," the court concluded that "[t]he power to confer degrees necessarily implies the power to revoke degrees erroneously granted." *Id.* at 852.

Other courts have followed suit. The United States District Court for the Western District of Virginia, applying Virginia law, held that "[b]ecause degree revocation is reasonably necessary to effectuate the Board's [express] power to confer degrees and to regulate student discipline, that power must be implied, giving the Board the authority to revoke a degree for good cause and after due process." *Goodreau v. Rector & Visitors of Univ. of Va.*, 116 F. Supp. 2d 694, 703 (W.D. Va. 2000). The Supreme Court of North Dakota, applying a state constitutional provision granting the State Board of Higher Education "full authority to control and administer the State's higher education institutions," explained that with such authority "comes the authority to award academic degrees," which in turn "naturally comes with the implied authority to revoke an improperly awarded degree upon good cause and a fair hearing." *Brown v. State ex rel. State Bd. of Higher Educ.*, 711 N.W.2d 194, 198 (N.D. 2006). Courts applying New Mexico law, Maryland law, Michigan law, and Tennessee law have reached similar conclusions. *See Hand v. Matchett*, 957 F.2d 791, 794 (10th Cir. 1992) (applying New Mexico law) (holding that implicit in the New Mexico State University Board of Regents' power to confer degrees "must be the authority to revoke degrees"); *Doe*, 107 F. Supp. 3d at 492 (applying Maryland law) ("Schools hold an implied power to control school records and to revoke credentials conferred upon

students . . . where such actions are in response to a former student's conduct that occurred during the student's enrollment, and as long as the school acts with good cause and after due process."); *Crook v. Baker*, 813 F.2d 88, 91–92 (6th Cir. 1987) (applying Michigan law) (citing *Waliga* and holding that the University of Michigan's Board of Regents, which has "general supervision" of the university under the Michigan Constitution, has the power to rescind the grant of a degree); *Faulkner v. Univ. of Tenn.*, No. 01-A-01-9405-CH00237, 1994 WL 642765, at *5 (Tenn. Ct. App. Nov. 16, 1994).

The court of appeals here deemed these cases inapposite in light of "jurisprudential differences in interpreting agency authority." 613 S.W.3d at 230–31 (noting that under Ohio law, as stated in *Waliga*, a power of a state agency may be implied from an express power "where it is reasonably related to the duties of an agency"); 613 S.W.3d at 255–56 (same). We nevertheless find them persuasive for several reasons.

First, the court of appeals went a step too far in describing Texas law regarding agency authority, concluding that a power may not be implied unless in its absence an express grant of authority "will itself be *defeated*." 613 S.W.3d at 230; *see also* 613 S.W.3d at 255. We have never endorsed such a standard; rather, as discussed, an agency has those "implied powers that are reasonably necessary to carry out its statutory duties." *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists*, 511 S.W.3d at 33. Further, the breadth of the constitutional and statutory grants of power to universities is remarkably similar among the states whose courts have addressed degree revocation. And those courts are united in the conclusion, as well as the reasoning behind it, that the

24

power to revoke a degree for academic misconduct "naturally comes from," *Brown*, 711 N.W.2d at 198, is "necessarily implie[d by]," *Waliga*, 488 N.E.2d at 852, is "[i]mplicit in" and "a necessary corollary to," *Hand*, 957 F.2d at 794–95, or is "reasonably necessary to effectuate" the express power to grant one, *Goodreau*, 116 F. Supp. 2d at 703.[16]

In the absence of supporting case law, K.E. and S.O. cite a 1969 Texas Attorney General opinion addressing whether the UT Board had authority to "declare null and void" a previously conferred Ph.D. in the face of findings that the graduate's dissertation was, among other things, "mainly plagiarism." Tex. Att'y Gen. Op. No. M-466, at 1–2 (1969). The Attorney General concluded that because the Legislature did not expressly "prescribe an administrative procedure whereby degrees awarded students may be cancelled or rescinded by the administrative board," a degree "can only be set aside or annulled by a Court of competent jurisdiction." *Id.* at 9. Attorney General opinions are persuasive, but not controlling, *Holmes v. Morales*, 924 S.W.2d 920, 924 (Tex. 1996), and we disagree with the opinion's analysis for several reasons.

---

[16] The dissent deems such cases unpersuasive for a different reason than the court of appeals: some of them cite a 1723 decision of the Court of King's Bench—erroneously, in the dissent's view—to buttress their conclusion. *See, e.g.*, *Waliga*, 488 N.E.2d at 852 (discussing *The King v. Univ. of Cambridge (Bentley's Case)* (K.B.1723), 8 Modern Rep. (Select Cases) 148). *Bentley's Case* is irrelevant to the courts' primary conclusion that the constitutional and statutory provisions governing public universities give rise to the implied authority to revoke an unearned degree. *See, e.g.*, *id.*; *Crook*, 813 F.2d at 91; *Brown*, 711 N.W.2d at 198; *Hand*, 957 F.2d at 794–95.

First, the Attorney General referenced the statutory provision granting the board authority to confer degrees and grant diplomas but said nothing about the provision broadly authorizing the board to "enact such by-laws, rules and regulations as may be necessary for the successful management and government of the University." *See* Act approved Apr. 23, 1895, 24th Leg., R.S., ch. 111, § 1, 1895 Tex. Gen. Laws 169, 169, *reprinted in* 10 H.P.N. Gammel's *The Laws of Texas 1822–1897*, at 899 (Austin, Gammel Book Co. 1898) (amended and recodified 1971). Second, the opinion relies on an at-best outdated view of a state agency's implied authority, concluding that the board could not have implied authority to annul a degree once conferred because the Legislature did not impose a "mandatory duty" to confer a particular degree in the first place. *See Corzelius v. R.R. Comm'n*, 182 S.W.2d 412, 415 (Tex. App.—Austin 1944, no writ). To the extent some cases contain language indicating that agency authority may be implied if reasonably necessary to fulfill an express statutory *duty* but not an express statutory *power*, it is by now well settled that an agency has those powers "necessarily implied from the statutory authority conferred *or* duties imposed." *Student Hous. Auth. v. Brazos Cnty. Appraisal Dist.*, 460 S.W.3d 137, 143 (Tex. 2015) (emphases added); *see also Stauffer v. City of San Antonio*, 344 S.W.2d 158, 160 (Tex. 1961). The Attorney General's erroneous distinction between duties and discretionary powers in this context significantly impacted its analysis.

Further, the Attorney General's conclusion that a "[c]ourt of competent jurisdiction" is the only appropriate forum for revocation of a degree is inconsistent with our recognition that "[j]udicial interposition

26

in the disciplinary decisions of state supported schools raises problems requiring care and restraint." *Than*, 901 S.W.2d at 931 (citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). The need for such restraint is particularly acute when those disciplinary decisions involve the exercise of academic judgment. *Villareal*, 620 S.W.3d at 907 (noting that "courts are ill equipped to evaluate the academic judgment of professors and universities").[17] The Attorney General opinion also ignores the fact that conferring a degree amounts to a *continuing* certification regarding the recipient's fulfillment of the university's requirements. That characteristic distinguishes revocation of a degree from rescission of other transactions requiring court intervention, like a sale of property. *Crook*, 813 F.2d at 93. Overall, we are unpersuaded by the Attorney General opinion's reasoning.[18]

In sum, we hold that the Boards' broad statutory authority to govern and administer the Systems and their component institutions, to determine the conditions for the award of degrees, and to award degrees necessarily encompasses the authority to determine that a student did not meet those conditions, and thus did not in fact earn a degree,

_____

[17] While not dispositive, the practical realities of the avenue championed by the Attorney General opinion and the dissent cannot be ignored. The result would effectively be that when a university concludes a former student procured a degree by academic dishonesty—and thereby did not in fact earn the degree—the university would have to file a lawsuit against the former student for cheating.

[18] As the University officials note, the Attorney General opinion concludes by stating that a university may still "tak[e] the legal position that by reason of the alleged fraud it will no longer recognize the degree in question and insofar as it is concerned has cancelled the same." M-466, at 9. The dissent appears to agree. *See post* at 9 n.3 (Blacklock, J., dissenting).

because of academic misconduct. Whether that determination occurs before or after a degree has been formally conferred is immaterial so long as the underlying conduct occurred during the student's tenure at the university and due process is provided.[19]

## IV. Prospective vs. Retrospective Relief in 20-0812

Notwithstanding our conclusion that the University officials have statutory authority to revoke K.E.'s Ph.D., K.E. further alleges that the disciplinary proceeding she underwent violated her due-process rights.[20] *See Than*, 901 S.W.2d at 929–30. She seeks injunctive relief ordering the University officials to reinstate her degree and "remove any notation

---

[19] In 20-0811, the University officials also argue that S.O.'s claims should be dismissed as unripe. Because we hold that they are barred by sovereign immunity, we dismiss them for that reason without addressing the ripeness issue.

[20] We note that K.E. has not challenged the revocation decision as unsupported by substantial evidence. As the parties correctly recognize, institutions of higher education are not state agencies under the Administrative Procedure Act, which therefore provides no statutory entitlement to judicial review of those institutions' decisions. TEX. GOV'T CODE § 2001.003(7)(E). However, we have recognized an "inherent right of appeal" in narrow circumstances, such as "[w]hen a vested property right has been adversely affected by the action of an administrative body so as to invoke the protection of due process." *Brazosport Sav. & Loan Ass'n v. Am. Sav. & Loan Ass'n*, 342 S.W.2d 747, 750 (Tex. 1961). We explained in *Brazosport* that such a right includes the opportunity to prove that the agency's "action was illegal or without support in substantial evidence." *Id.* at 752; *see also Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 566 (Tex. 2000) (explaining that a substantial-evidence review is limited to determining whether "more than a mere scintilla" of evidence supports the agency's determination). Whether K.E. may pursue an ultra vires claim premised on a lack of substantial evidence to support the revocation decision, and the proper outcome of such a review, is not before us.

that states or suggests [her] degree was revoked." The University officials argue that these claims remain barred by sovereign immunity because K.E. seeks only "backwards-looking" retrospective relief to rectify an "already-complete governmental action." We disagree.

It is true that ultra vires claimants "may seek only prospective injunctive remedies." *Chambers–Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 348 (Tex. 2019) (citing *Heinrich*, 248 S.W.3d at 369). But that is exactly what K.E. seeks. She asserts that the University officials acted ultra vires in revoking her Ph.D. without providing due process and requests restoration of her degree on a forward-looking basis. If she succeeds on that claim,[21] she is entitled to such relief. Indeed, the University officials' position on this issue is troublingly inconsistent with the arguments they make regarding their authority to revoke K.E.'s degree in the first place. As discussed, we agree with the University officials that academic degrees "are a university's certification to the world at large of the recipient's educational achievement and fulfillment of the institution's standards." *Waliga*, 488 N.E.2d at 852. That "certification" is not an isolated event but a continuing one. Just as a university need not continue making a false certification "to the world at large" that a recipient earned a degree when she in fact did not, it may not continue making a certification that

---

[21] The University officials do not argue in this Court that the due-process claim is facially invalid. *See Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015) (noting that "immunity from suit is not waived if the constitutional claims are facially invalid"). We express no opinion on the merits of the claim.

29

a recipient did *not* earn a degree when that conclusion has not been made in accordance with the law.

Our opinion in *Than*, in which we held that a medical student "was not afforded adequate procedural due process before his expulsion" for cheating on an exam, supports this conclusion. 901 S.W.2d at 929. There, we affirmed a permanent injunction ordering that, pending a new hearing on the charge of academic dishonesty, the university remove from the student's transcript the "F" grade he received in the class and remove from his records "the penalty of expulsion." *Id.* at 934. Similarly here, if the trial court determines that K.E. was not afforded adequate procedural due process before the University officials revoked her degree, an injunction ordering the degree reinstated and the penalty removed from her records pending a new hearing would be appropriate. *See id.*

## V. Remaining Claims

As discussed, in 20-0811 the trial court denied the University officials' plea to the jurisdiction as to the declaratory-judgment claims regarding the officials' authority to revoke S.O.'s degree—and granted summary judgment for S.O. on those claims—but the court granted the jurisdictional plea as to S.O.'s other claims. The court of appeals affirmed the order as to the subset of claims that S.O. appealed, and S.O. does not seek review of those rulings here. Accordingly, no claims remain to remand to the trial court. In the event that the University officials pursue disciplinary proceedings against S.O. and ultimately decide to revoke her degree, S.O. may seek judicial relief at that time if she believes she was not afforded due process. *See id.* at 930 (holding

30

that the stigma associated with a medical student's dismissal for academic dishonesty implicated a protected liberty interest "that must be afforded procedural due process").

In 20-0812, however, the trial court denied the University officials' plea to the jurisdiction in its entirety, and the court of appeals affirmed. Because we have held that K.E. seeks prospective relief with respect to her due-process claims and the University officials offer no other basis in this Court to disturb the court of appeals' judgment as to those claims, they remain pending and must be remanded for further proceedings.

## VI. Conclusion

We hold that the University officials have statutory authority to revoke the degree of a former student for engaging in academic misconduct while a student at the University. K.E.'s and S.O.'s claims for declaratory relief to the contrary are thus barred by sovereign immunity. Accordingly, we reverse the court of appeals' judgments with respect to those claims and dismiss them for lack of jurisdiction. In 20-0812, we affirm the court of appeals' judgment with respect to K.E.'s due-process claims and remand the case to the trial court for further proceedings.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** March 31, 2023

31